914 F.2d 620
 59 USLW 2250
 LEAGUE OF UNITED LATIN AMERICAN CITIZENS COUNCIL NO. 4434,
Plaintiffs-Appellees,
and
Jesse Oliver, et al., Intervening Plaintiffs-Appellees,
v.
William P. CLEMENTS, etc., et al., Defendants,
Jim MATTOX, et al., Defendants-Appellees, Appellants,
v.
Judge F. Harold ENTZ, etc., Judge Sharolyn Wood, etc., and
George S. Bayoud, Jr., etc., Defendants-Appellants,
and
Tom Rickhoff, Susan D. Reed, John J. Specia, Jr., Sid L.
Harle, Sharon Macrae and Michael P. Pedan, Bexar
County, Texas State District Judges, Appellants.
 No. 90-8014.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 28, 1990.
 
 Robert H. Mow, Jr., Bobby M. Rubarts, David C. Godbey, Jr., Hughes & Luce, Sidney Powell, Strasburger & Price, Dallas, Tex., for Entz.
 J. Eugene Clements, Evelyn V. Keyes, Porter & Clements, Houston, Tex., for Wood.
 John L. Hill, Jr., Andy Taylor, Liddell, Sapp, Zivley, Hill & Laboon, Houston, Tex., for Bayoud.
 Seagal V. Wheatley, Donald R. Philbin, Jr., Oppenheimer, Rosenberg, Kelleher & Wheatley, Gerald H. Goldstein, Goldstein, Goldstein & Hilley, Joel H. Pullen, Kaufman, Becker, Pullen & Reibach, San Antonio, Tex., for Rickhoff et al.
 R. James George, Jr., Graves, Dougherty, Hearon & Moody, John M. Harmon, Margaret H. Taylor, Austin, Tex., for Chapman, Stovall, Schraub, Cornyn, Hester, Paxson, Kirk & Walker.
 Michael E. Tigar, Austin, Tex., for Bexar County, etc., et al.
 Michael Ramsey, Ramsey & Tyson, Houston, Tex., for amicus 27 Incumbent Judges of Harris County.
 Daniel M. Ogden, Washington Legal Foundation, Paul Strohl, Washington, D.C., for amicus curiae, Washington Legal Foundation, in support of defendant-intervenor Dallas County Judge F. Harold Entz.
 Thomas F. Rugg, Chief, County Dist. Attys. Office, Beaumont, Tex., Mark H. Dettman, Midland, Tex., for amicus curiae, Jefferson County Dist. Judges.
 Rolando L. Rios, San Antonio, Tex., for League of United Latin Am. Citizens & Christina Moreno.
 Susan Finkelstein, San Antonio, Tex., for Christina Moreno.
 Walter L. Irvin, Dallas, Tex., for amicus Brashear, et al. on behalf of appellees.
 William L. Garrett, Garrett, Thompson & Chang, Dallas, Tex., for appellees.
 Gabriell K. McDonald, Matthews & Branscomb, Austin, Tex., for Legislative Black Caucus and Houston Lawyers Assoc.
 Jim Mattox, Atty. Gen., Austin, Tex., pro se.
 Renea Hicks, Javier Guajardo, Sp. Asst. Attys. Gen., Austin, Tex., for Mattox, et al. & Bayoud (in his official capacity only).
 Sherrilyn A. Ifill, NAACP Legal Defense and Ed. Fund, Inc., New York City, N.Y., for Houston Lawyers Assoc.
 Edward B. Cloutman, III, Mullinax, Wells, Baab & Cloutman, E. Brice Cunningham, Dallas, Tex., for Jesse Oliver, et al.
 Robert G. Pugh, Robert G. Pugh, Jr., Shreveport, La., Kenneth C. DeJean, Baton Rouge, La., for amicus Roemer.
 Cynthia Rougeou, Legal Div., Office of Sec. of State, Baton Rouge, La., for La. Secretary of State.
 Michael Rubin, Rubin, Curry, Colvin & Joseph, Baton Rouge, La., for La. D. Judges Assoc.
 Fournier J. Gale, III, Maynard, Cooper, Frierson, N. Birmingham, Ala., for amicus State of Alabama.
 Ernest L. Johnson, Baton Rouge, La., for Janice Clark, et al.
 Susan E. Russ, Spec. Asst. Atty. General, Montgomery, Ala., for State of Alabama, et al.
 Appeal From the United States District Court for the Western District of Texas.
 Before CLARK, Chief Judge, GEE, POLITZ, KING, JOHNSON, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, DUHE, WIENER, and BARKSDALE, Circuit Judges.*
 GEE, Circuit Judge:
 
 
 1
 Today we must decide whether Congress, by amending Section 2 of the Voting Rights Act in 1982 to add a "results" test for dilution of minority voting strength, meant to subject the selection of state judges to the same test as that for representative political offices by incorporating language from the Supreme Court decision in White v. Regester.[1] For reasons to be given--and for the cardinal reason that judges need not be elected at all--we conclude that it did not.
 
 
 2
 In summary, these are that Congress was at great pains to phrase the new Section 2 in such language as to make clear that its results test applies to voting in elections of representatives only; that as of the amendment's time judicial offices had never been viewed by any court as representative ones; that characterizing the functions of the judicial office as representative ones is factually false--public opinion being irrelevant to the judge's role, and the judge's task being, as often as not, to disregard or even to defy that opinion, rather than to represent or carry it out; that, because of the highly intrusive nature of federal regulation of the means by which states select their own officials, legislation doing so should not be pushed beyond its clear language; and that, in view of these considerations, we should place such a construction on the 1982 enactment reluctantly and only if Congress has clearly mandated such a singular result.
 
 
 3
 We have carefully weighed the text and provenance of the statutory language against the opposing factors urged upon us as interpretive guides. Having done so, we conclude that the language of the 1982 amendment is clear and that it extends the Congressional non-Constitutional "results" test for vote dilution claims no further than the legislative and executive branches, leaving the underlying, Constitutional "intent" test in place as to all three. Especially telling, we conclude, is the circumstance that in borrowing language from the Court's White opinion Congress focused upon its reference to electing "legislators," broadening it so far, but only so far, as to electing "representatives," a term inclusive of elective members of the executive branch as well as of the legislature but not--as, say, state officials would have been--of members of the judiciary. That Congress did exactly as we have described is as undeniable as it is inexplicable on any basis other than that of a legislative purpose to include all elected legislative and executive state officials but to exclude elected judges.
 
 
 4
 Finally, and bearing in mind the well-settled principle of statutory construction that the enacting Legislator is presumed to have been aware of the judicial construction of existing law,[2] we note that, as of the time of the addition of Section 2(b) and of the explicit results test to the Voting Rights Act, every federal court which had considered the question had concluded that state judges were not "representatives" and did not fall within the definition of that term. Had Congress, then, meant to exclude votes in judicial elections from the ambit of its new results test, it could scarcely have done so more plainly than by adopting the term "representative" to describe that ambit.
 
 Facts and Procedural History
 
 5
 The underlying facts of this appeal are carefully and correctly set out in the panel opinion, 902 F.2d 293 (5th Cir.1990); we recapitulate them here no further than is necessary to an understanding of what we write today.
 
 
 6
 Plaintiffs attacked the Texas laws providing for county-wide, at-large election of judges of the trial court of general jurisdiction, asserting that the imposition of a single-member system was necessary to prevent dilution of black and Hispanic voting strength. In a bench trial, the federal court rejected their constitutional arguments grounded in the Fourteenth and Fifteenth Amendments, finding a failure to prove the requisite discriminatory intent for relief under those provisions. The court determined, however, that the Texas law produced an unintended dilution of minority voting strength, a circumstance sufficient to call for relief under the Voting Rights Act, as amended in 1982 to incorporate a "results" test dispensing with the necessity of proof of discriminatory intent. In consequence, and after pausing to allow for possible remedial action by the state, the court enjoined further use of the at-large system, confected and imposed a system of single-member elections, and directed that these be held last Spring.
 
 
 7
 On appeal, we stayed the court's order, expedited the appeal, held a panel hearing on April 30, and handed down an opinion on May 11. Four days later, pursuant to a majority vote of active judges, we ordered rehearing of the appeal en banc; and we now render our opinion.
 
 Analysis
 The Panel Opinion
 
 8
 At the time of its decision, our panel was constrained by an earlier decision of the Circuit holding that Section 2 of the Act applied to elections held to fill positions on the Louisiana Supreme Court, a seven-member body.[3] Chisom v. Edwards, 839 F.2d 1056 (5th Cir.1988). Constraint was superfluous, however; for the panel embraced and agreed with the holding and reasoning of Chisom applying the Act to judicial elections. It went on, however, to conclude that although in its view judges were indeed "representatives of the people," and although as their representatives the judges' elections were controlled by Section 2(b) of the Act, the elections of trial judges were not subject to voter-strength dilution concerns because their offices are single-member ones; and there is no such thing as a "share" of a single-member office. LULAC v. Clements, 902 F.2d 293, 305 (5th Cir.1990). See Butts v. City of New York, 779 F.2d 141 (2d Cir.1985), cert. denied, 478 U.S. 1021, 106 S.Ct. 3335, 92 L.Ed.2d 740 (1986) (offices of mayor, council president, comptroller are single-member ones) and United States v. Dallas County, Ala., 850 F.2d 1433 (11th Cir.1988) (county probate judge). A vigorous dissent by Judge Johnson, author of the panel opinion in Chisom, disputed the panel majority's characterization of judges from multi-judge districts as holders of single-member offices. We need not resolve this disagreement within the panel, however, as we do not reach the issue.
 
 Statutory Background
 
 9
 Originally enacted in 1965 as an anti-test, anti-device provision to relieve blacks of state-law strictures imposed upon their Fifteenth Amendment voting rights, Section 2 of the Voting Rights Act was construed by the Supreme Court in City of Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), as adding nothing to the Fourteenth and Fifteenth Amendment claims there made and as requiring, for its enforcement, proof of racially-discriminatory intent. At the time of Bolden, Section 2 read:
 
 
 10
 No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title.
 
 
 11
 Congress reacted to Bolden by amending Section 2 to add to the statute a limited "results" test, to be applied and administered "as provided in subsection (b) of this section." As amended, Section 2 was cast in two subsections:
 
 
 12
 (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.
 
 
 13
 (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
 
 
 14
 Earlier, in the course of deciding White, a 1973 voting rights case invoking constitutional grounds, the Court had described the required standard of proof in felicitous terms:
 
 
 15
 The plaintiffs' burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question--that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice.
 
 
 16
 412 U.S. at 766, 93 S.Ct. at 2339 (emphasis added).
 
 
 17
 Casting about for appropriate language in which to couch its new subsection, and having inserted the reference to results in old Section 2, Congress settled upon the italicized portion of Justice White's opinion quoted above, adopting it with only one significant alteration.
 
 
 18
 New subsection (b), then, is patterned on the White court's language and provides with great specificity how violations of the newly incorporated results test must be established: a violation is shown on a demonstration, by the totality of the circumstances, that state (or political subdivision) nomination and election processes for representatives of the people's choice are not as open to minority voters as to others. The precise language of the section is significant; a violation is shown, it declares, if it is established that members of the protected classes
 
 
 19
 have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.[4]
 
 
 20
 Both the broad and general opportunity to participate in the political process and the specific one to elect representatives are thus treated in the new section.[5] As for the former, protecting it appears to involve all of the primal anti-test, anti-device concerns and prohibitions of original Section 2; and its provisions may well extend to all elections whatever, as did they.[6] These broader considerations center on the voter and on his freedom to engage fully and freely in the political process, untrammeled by such devices as literacy tests and poll-taxes. Where judges are selected by means of the ballot, these safeguards may apply as in any other election, a matter not presented for decision today. The second consideration--opportunity to elect representatives of one's choice--is also couched in the language borrowed from White v. Regester, 412 U.S. 755, 766, 93 S.Ct. 2332, 2339, 37 L.Ed.2d 314 (1973); and, as we have noted, the Congress was at some pains to adapt and broaden the Court's phrases so as to convey its precise meaning. Before pursuing this aspect of our inquiry further, however, we turn aside to consider briefly the nature of the judicial office and two other closely related topics: judicial selection and the state of authority on judges' status as representatives.
 
 The Judicial Office
 
 21
 Senators and members of the House of Representatives hold clearly political offices. Today, both are directly elected by the people; and it is their function as representatives to synthesize the opinions of their constituents and reflect them in the debate and deliberation of public issues.[7] The executive branch of the government, headed by our highest officer elected at large in the nation, is also expected to bring the views and opinions which he offered the electorate in seeking the Presidency to bear on the job of running the federal machinery.
 
 
 22
 By contrast, the judiciary serves no representative function whatever: the judge represents no one.[8] As Professor Eugene Hickok has recently observed, in terms upon which we cannot improve:
 
 
 23
 The judiciary occupies a unique position in our system of separation of powers, and that is why the job of a judge differs in a fundamental way from that of a legislator or executive. The purpose of the judiciary is not to reflect public opinion in its deliberations or to satisfy public opinion with its decisions. Rather, it is to ensure that the ordinary laws do not run contrary to the more fundamental law of the Constitution, to resolve disputes and controversies surrounding the law, and to resolve disputes among contesting parties over the meaning of the law and the Constitution. If a member of congress serves to make the law and a president to enforce it, the judge serves to understand it and interpret it. In this process, it is quite possible for a judge to render a decision which is directly at odds with the majority sentiment of the citizens at any particular time. A judge might find, for example, a very popular law to be unconstitutional. Indeed, it can be argued that the quality most needed in a judge is the ability to withstand the pressures of public opinion in order to ensure the primacy of the rule of law over the fluctuating politics of the hour.
 
 
 24
 Hickok, op. cit. supra n. 7, at 5.
 
 
 25
 Thus the scholar, and with one voice the case authority of the time agreed. In 1982, as of the time of Congress's adoption of the Court's language from White, at least fifteen published opinions by federal courts--opinions which we list in the margin--had held or observed that the judicial office is not a representative one, most often in the context of deciding whether the one-man, one-vote rubric applied to judicial elections.[9] Not one had held the contrary.
 
 
 26
 Typical of these is the opinion in Wells v. Edwards, a decision by a three-judge district court from our own circuit which was affirmed on appeal by the Supreme Court.[10] There, after reviewing various authorities, the district court expressed the entire rationale of its view as follows:"Judges do not represent people, they serve people." Thus, the rationale behind the one-man, one-vote principle, which evolved out of efforts to preserve a truly representative form of government, is simply not relevant to the makeup of the judiciary.
 
 
 27
 "The State judiciary, unlike the legislature, is not the organ responsible for achieving representative government."
 
 
 28
 347 F.Supp., at 455-56 (quoting from Buchanan v. Rhodes, 249 F.Supp. 860 and New York State Association of Trial Lawyers v. Rockefeller, 267 F.Supp. 148). It is impossible, given the single point at issue and the simple reasoning stated, to believe that the majority of the Supreme Court, in affirming Wells, did not concur in that reasoning. If there were doubt, however, it would be laid to rest by the terms of the dissent, which attacks the district court opinion in stern, egalitarian terms for having, like other opinions cited by it, held "that the one-person, one-vote principle does not apply to the judiciary." 409 U.S. 1095, 1096 n. 2, 93 S.Ct. 904, 905 n. 2. Nor is it likely, we think, that the Supreme Court would hold, as it necessarily did in affirming Wells v. Edwards, that although for purposes of the Equal Protection Clause of the Fourteenth Amendment judges "do not represent people," all the same, for purposes of Section 2(b) of the Voting Rights Act, judges are "representatives of [the people's] choice." Both must be true, or neither one.[11]
 
 
 29
 Wells is not only instructive as to the meaning of "representatives" and thus as to the scope of Section 2, it is dispositive of the precise issue of the scope of Section 2's applicability raised in this case. The Wells holding--that the one-person, one-vote rule does not apply to the judiciary--leads inexorably to the conclusion that judicial elections cannot be attacked along lines that their processes result in unintentional dilution of the voting strength of minority members. Absent the one-person, one-vote rule--that the vote of each individual voter must be roughly equal in weight to the vote of every other individual voter, regardless of race, religion, age, sex, or even the truly subjective and uniquely individual choice of where to reside--there is no requirement that any individual's vote weigh equally with that of anyone else. This being so, and no such right existing, we can fashion no remedy to redress the nonexistent wrong complained of here.
 
 
 30
 The notion of individual vote dilution, first developed by the Supreme Court in Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), was the foundation for the concept of minority vote dilution to be later elaborated in Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971)[12], White v. Regester, supra, and Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir.1973). Individual vote dilution was remedied by the Court through the concept of one-person, one-vote--the guarantee of substantial equality among individual voters. With that guarantee in mind, remedial schemes to combat minority vote dilution were devised on a case by case basis.
 
 
 31
 Almost twenty years ago, we articulated the conceptual link between individual vote dilution and minority vote dilution, making clear the latter's dependence on the former:
 
 
 32
 Inherent in the concept of fair representation are two propositions: first, that in apportionment schemes, one man's vote should equal another man's vote as nearly as practicable; and second, that assuming substantial equality, the scheme must not operate to minimize or cancel out the voting strength of racial elements of the voting population.
 
 
 33
 Zimmer, 485 F.2d at 1303 (emphasis added).
 
 
 34
 For it is the assumption of substantial equality (achieved through the guarantee of one-person, one-vote) that underlies the concept of minority vote dilution. This assumption, the Court held in Wells, does not obtain in judicial elections; and without that assumption there exists no yardstick by which to measure either the "correct" magnitude of minority voting strength or the degree of minority vote dilution. Thus, on a conceptual level, and to paraphrase Justice Harlan, we are asked to undertake the ineffable task of equalizing that which we cannot measure. Whitcomb, 403 U.S. at 169, 91 S.Ct. at 1883 (Harlan, J., separate opinion).
 
 
 35
 We are therefore unable to take the crucial step from individual vote dilution to minority vote dilution in this case, not only because the holding in Wells forbids us to assume the existence of "substantial equality," but because it compels us to recognize that no such equality need exist in the arena of judicial elections. The bridge between the two concepts, fashioned by the Court in Reynolds v. Sims and applied there to state legislatures, is of limited length and, as the Court made clear by affirming Wells v. Edwards, does not extend to the judiciary.
 
 
 36
 Finally, as the district court stated in Wells:
 
 
 37
 The primary purpose of one-man, one-vote apportionment is to make sure that each official member of an elected body speaks for approximately the same number of constituents.
 
 
 38
 Wells, 347 F.Supp. at 455.
 
 
 39
 We reiterate that judges do not represent people and, thus, have no constituents. Judges speak the voice of the law. In doing so they speak for and to the entire community, never for segments of it and still less for particular individuals. To describe the judge's office merely as "not a representative one" is a gross understatement; in truth, it is rather the precise antithesis of such an office. Just insofar as a judge does represent anyone, he is not a judge but a partisan.
 
 New Section 2(b)
 
 40
 So the land lay when Congress enacted Section 2(b) in 1982, choosing to replace the term "legislator" in the White phraseology with the term "representative"--a term which is employed only at this spot and appears nowhere else in the entire Voting Rights Act. By the settled canon of construction, we must presume that Congress was aware of the uniform construction which had been placed by the courts on the term that it selected, a construction by which the judicial office was not deemed a "representative" one. Goodyear Atomic Corp. v. Miller, 486 U.S. 174, 108 S.Ct. 1704, 100 L.Ed.2d 158 (1988); Sutton v. United States, 819 F.2d 1289 (5th Cir.1987). Against this background, then, the Congress deliberately picked a term of art for use in amending Section 2 that up to that time had been universally held, and which it knew had been universally held by every federal court that had considered it as of that date, neither to include judges nor to comprise judicial offices. In view of these circumstances, we find it all but impossible to avoid the conclusion that Congress intended to apply its newly imposed results test to elections for representative, political offices but not to vote dilution claims in judicial contests, leaving the latter to be regulated and controlled by state law, by the Constitution, or by other provisions of the Voting Rights Act.[13] Given the mutual exclusiveness of the two terms, to suggest that Congress chose "representatives" with the intent of including judges is roughly on a par with suggesting that the term night may, in a given circumstance, properly be read to include day.
 
 
 41
 We are further persuaded by the knowledge that in amending Section 2 Congress was well aware of the genesis of the concept of minority vote dilution. The legislative history makes clear that Congress knew that "[t]he principle that the right to vote is denied or abridged by dilution of voting strength derives from the one-person, one-vote reapportionment case of Reynolds v. Sims." S.Rep. No. 417, 97th Cong., 2d Sess., reprinted in 1982 U.S.Code Cong. & Admin.News at 177, 196. Given its awareness of the Wells v. Edwards holding--that the one-person, one-vote rule does not apply to the judiciary--we must conclude that Congress, aware of the combined effect of Reynolds and Wells, limited the scope of amended Section 2 so as to rule out the judicial branch, an area within which the issue of the viability of minority vote dilution claims had been well settled.
 
 Countervailing Arguments
 
 42
 Thus we find on one side of the argument whether Section 2(b)'s results test for elections applies to judicial ones the Congress's carefully chosen term of art--"representatives"--deliberately selected by Congress and placed in the section itself, with a settled legal meaning excluding judges. On the other side are ranged contentions of a more attenuated and derivative nature, which we now consider briefly.
 
 
 43
 First we are told that the definition of "voting," included in the original act as Section 14(c)(1) and now codified as 42 U.S.C. Sec. 1973l (c)(1), refers to "candidates for public or party office" and that, since judicial hopefuls are included within the generality of such a reference to candidates, the results test which applies to all others must be applied to them as well. The specific controls the general here, however, as in any other instance of statutory construction; and we see little force in the claim that an inference from a general term buried in a definitional section far from Section 2 should control the specific and supervening language inserted by Congress in the section itself. Nor is there any necessary conflict between the two provisions: as we have noted, it is only the application of the results test portion of amended Section 2 to vote dilution claims in judicial elections that is at issue today. Other portions of the section may well apply to such elections, as may the results test to claims other than those of vote dilution, along with the indubitably applicable Constitutional prohibitions against any intentional act of discrimination in any electoral aspect.
 
 
 44
 The same answer also refutes the next argument: that because, as was held in Haith v. Martin, 618 F.Supp. 410 (E.D.N.C.1985), aff'd mem., 477 U.S. 901, 106 S.Ct. 3268, 91 L.Ed.2d 559 (1986), Section 5 of the Act applies to state judicial elections, Section 2 must apply as well. As we have explained, portions of Section 2 may well apply--except for the results test introduced in response to the holding in Bolden to govern vote dilution in the election of "representatives," which by its own terms does not.
 
 
 45
 Next we are told, in yet another general argument similar to those we have just rejected, that we must apply the dilution results test to judicial elections because the 1982 amendments to Section 2 were intended to expand, rather than to restrict, the section's coverage. Doubtless they were generally so intended; doubtless they did so; but the presence of a general intent to expand coverage requires neither an expansion at all points nor the maximum imaginable expansion at any and is not even necessarily at odds with a specific intent to restrict coverage at one or another of them. Section 2 was greatly expanded, expanded to add a results test to the intent test of the Fourteenth and Fifteenth Amendments--expanded in most respects, but not in all.
 
 
 46
 Finally, in a scatter of birdshot contentions, counsel point to the broad construction that the Attorney General has historically accorded the Voting Rights Act, to the absence in the Act's legislative history of any explicit statement that judicial elections are not covered, to the presence in that history of references to statistics on minority performance in various elections (including judicial ones), and to a single reference to "judicial districts" in a cautionary parade of horribles to be found in a subcommittee report hostile to the proposed 1982 amendments. None of these seems to us to weigh very heavily in the scales against the specific terminology of Section 2 itself.[14] In the words of Justice Frankfurter, writing for a unanimous court in Greenwood v. United States, it appears to us that "this is a case for applying the canon of construction of the wag who said, when the legislative history is doubtful, go to the statute." 350 U.S. 366, 374, 76 S.Ct. 410, 415, 100 L.Ed. 412 (1956).
 
 
 47
 It is, and we do so.
 
 Conclusion
 
 48
 In no area should federal courts tread more cautiously than where it is contended that Congress has imposed incremental Federal power on the States; and the nearer to the core of traditional state authority and concern we are asked to venture, the more warily we should tread. The point is elegantly made by the panel opinion in this very case:
 
 
 49
 Few would quarrel with the assertion that Section 2(b) as interpreted has worked a fundamental change in the Act, highly intrusive to the states. We have insisted in other contexts that Congress clearly state its intent to supplant traditional state prerogatives. Judicial insistence upon clear statement is an important interpretative tool vindicating concern for separation of powers and federalism. See Atascadero State Hospital v. Scanlon, 473 U.S. 234, 105 S.Ct. 3142 [87 L.Ed.2d 171] (1985); Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 104 S.Ct. 900 [79 L.Ed.2d 67] (1984) (Pennhurst II ). This insistence upon an "unequivocal expression of congressional intent," Pennhurst II, 465 U.S. at 99, 104 S.Ct. at 907, is based upon the fundamental nature of the interests at stake. "The 'constitutionally mandated balance of power' between the states and the Federal Government was adopted by the Framers to ensure the protection of 'our fundamental liberties.' " Atascadero, 105 S.Ct. at 3147 (quoting Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 572, 105 S.Ct. 1005, 1028 [83 L.Ed.2d 1016] (1985) (Powell, J., dissenting)).
 
 
 50
 LULAC, 902 F.2d at 301.
 
 
 51
 It is hard to envision any area lying closer to the core of state concerns than the process by which it selects its own officers and functionaries. Any federal trenching here strikes at federalism's jugular; and such a radical federal trenching as is contended for today should therefore demand a very clear statement indeed. Instead, as regards the issue in this case, our investigation reveals an all but total absence of relevant legislative history and a statutory text that unambiguously excludes elections of non-representative state officers from Section 2's highly intrusive results test. If this was not the intended effect of Congress's substitution of representatives for legislators in Justice White's language, no other suggests itself; and we must reject any notion that Congress went to all the trouble of selecting that language and carefully modifying it, just so far and no further, randomly and with nothing particular in mind.[15] It is never proper for us to extend a statute's force by construction into areas where Congress has not seen fit or has been unable to agree to go, and never less proper than in such supremely sensitive territory as this.
 
 
 52
 Judicial offices and judicial selection processes are sui generis in our nation's political system; they determine the referees in our majoritarian political game. These offices are not "representative" ones, and their occupants are not representatives. Indeed, the state processes for filling them need not even be elective, as those for all representative offices presumably must be. See U.S. Const., Art. 4, Sec. 4. In 1982, when Congress determined to expand Section 2 of the Act to incorporate a results test for vote dilution, it stopped short of imposing such a test for judicial offices on the States by limiting it to their election of "representatives." Should Congress seek to install such a test for judicial elections, it must say so plainly. Instead, it has thus far plainly said the contrary. Chisom v. Edwards, 839 F.2d 1056 (5th Cir.1988) is overruled.
 
 
 53
 REVERSED.
 
 CLARK, Chief Judge, concurring specially:
 
 54
 This brief soliloquy is necessarily said, in my respectful view, because every other opinion goes farther than the Voting Rights Act intends. My brothers Gee and Higginbotham are at odds about the way the court should take to reach the same result. While their disagreement centers on the representative nature of the judicial office, the essence of their analyses of the impact of racial vote dilution in this judicial election process based on the nature of the office is similar--so similar that, if their opinions were expressly limited to the facts of the present case, I agree with both.
 
 
 55
 There is no disagreement that Section 2 of the Voting Rights Act, before its amendment, forbade any practice or procedure that abridged the right to vote because of race or color. All also agree that the legislative intent of the amendment was only to broaden the test for vote dilution from "intent" to "result."
 
 
 56
 The elements of Judge Gee's analysis are that, since section 2(b) defines vote dilution in terms of representatives, no vote dilution claim can be made in any election of a judicial officer because a judge can never be a representative--a conclusion he finds confirmed by the Supreme Court's refusal in Wells v. Edwards to apply one-man, one-vote standards to judicial election districts.
 
 
 57
 Judge Higginbotham rejects this analysis. He would base reversal on the premise that none of several elected trial judges who all function singularly in their work can be subject to the single-member redistricting claim made here. My concern is that the court's opinion, as now written, puts vote dilution attacks on (1) judicial elections which cannot be resolved by examining the nature of the office, and (2) "issue" elections (such as referenda on constitutional amendments and bond issue elections) beyond the reach of amended section 2.
 
 
 58
 Judge Gee starts with the observation that the words of section 2 expressly limit vote dilution to elections of representatives. I can readily agree section 2 does not apply to the elections challenged here. It involves only the election of persons and voter impact turns entirely on the nature of the judicial office. This brings section 2(b) into play. The inherent nature of the judicial function and, indeed, the constitutional limits of due process require that every judge be impartial between litigants and neutral as to claims presented. In the discharge of official duties, no judge can ever "represent" the electors in the jurisdiction served by the court. A vote for a judge differs from a vote for other types of officers. Whether the choice be for councilman, sheriff or governor, and whether it be based on whim or party or nonpartisan analysis of the individual candidate, votes for these types of officials are cast for those who will best express the wishes and views of their constituents. This cannot be so when a voter picks a judge. Legislators and executives are expected to represent. Voters must know judges cannot. The same principles control when a state provides for election rather than appointment of its judiciary. The choice seeks to assure the public that the judicial function will be kept accountable to the common sense of the electorate. It is expected that candidates who lack training or a reputation for honesty or sound intellect will not be elected. In like manner, those who are indolent, will not decide cases or decide erratically will not be re-elected. Overarching any considerations of voter motivation is the due process neutrality required in the conduct of the office. It does not permit the judge's responsiveness to the electorate's concept of common sense to become representation of the electorate. The State of Texas has a strong interest, and, indeed, a fundamental right to choose to have these judges elected in the manner provided here. Its choice does not violate amended section 2.
 
 
 59
 The difficulty I have with Judge Gee's analysis is that it has no limit. There are many types of elections which involve issues, not candidates, which surely ought to be subject to the vote dilution stricture of section 2 despite the absence of any question of representation. But merely noting the applicability to "issue" elections would not adequately define the reach of section 2. It is imperative, in my view, that a bright circle be drawn around judicial elections as well. Judge Gee's reasoning would expressly deny section 2(a) coverage to judicial elections in situations beyond today's facts, as he makes clear by overruling Chisom v. Edwards. Section 2(a) is an integral part of a remedial statute. It deserves to be interpreted so as to prevent racial vote abridgment even when it occurs in a judicial election. The phrase "as provided in subsection (b) of this section" which appears at the end of subsection (a) should be read as giving an example of proscribed vote dilution. It does not provide that section 2(b) establishes the only way the section can be violated.
 
 
 60
 It is clear to me that when a state continues to apply a voting procedure in a manner which now results in an abridgment of the right of a citizen to vote on account of race, that procedure is still condemned by amended section 2(a), just as it was before the amendment.
 
 
 61
 Nothing we say today should be taken as passing on a claim that a judicial election process in which judges are elected by fewer than all of the eligible voters within the jurisdictional area of the court on which the judge will serve has become a violation of section 2. Such elections involve districting of voters in a manner entirely unrelated to the representative nature of the judge's office.
 
 
 62
 [Thornburg v.] Gingles [478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986) ] tells me that whether the political process chosen by Texas for selecting its judges is equally open depends upon evaluation of past and present reality under a functional view of the process. There is nothing wrong with the state's choice to elect any number of a county's district judges county-wide. However, if the state has chosen to divide a single judicial jurisdiction into separate groups of electors, that choice could, with changes in demographics or other conditions come to raise real issues of racial gerrymander, gross diminution of voting strength, candidate slating ability or other violations of equal protection which have nothing to do with the due process concerns which control the execution of judicial duties, or with the manner in which the office of judge is carried out. Of course, I agree that Wells v. Edwards establishes that approximate numeric equality of voters between judicial districts is not required. However, we need not and should not decide now that judicial subdistricts which grow to have gross numeric or racial disparities in their make-up will always be free of possible section 2 problems. For this reason, I respectfully, but expressly, disagree with the majority's flat-out overruling of Chisom v. Edwards.
 
 
 63
 We are not confronted here with any claim of vote dilution resulting from long-established subdistricts alleged to have become racially invidious on a basis of intra-jurisdictional voter distribution. This was the claim that was before this court in Chisom. The holding in Chisom reversed a dismissal on the pleadings. I agree that such a reversal was proper, even though I cannot agree with all said in Part I of Judge Higginbotham's concurrence or Judge Johnson's dissent because both deny vitality to section 2(b). Since we are writing en banc, I am free to disagree with the reason given for the result in Chisom--that section 2 applies to all judicial elections. I am of the opinion that it is equally wrong to say that section 2 covers all judicial elections as it is to say it covers none. However, if today's facts were the same as Chisom 's, I would hold a claim that judicial subdistricts, once having no invidious purpose, but alleged, over time, to have come to abridge section 2 rights, must be factually developed and cannot be dismissed on pleadings alone.
 
 
 64
 If the issue were reached in today's case, I would also agree with Judge Higginbotham that the presence of multiple judicial posts on the ballots of plaintiffs here gives them no section 2 right to have single-judge subdistricts drawn. I would do so because I am not required to agree that the principle applies on any broader scale than the facts before us present. His function-of-the-office analysis is, to me, identical in concept to the majority view. The caveat I think must be added to both is that only when the area of jurisdiction of each of several jurist to be elected is coextensive with the area of residence of those that elect them, is each vote for a judge bound to be equal to every other vote that may be cast.
 
 
 65
 I would not agree with Judge Higginbotham that the single-judge, trial-court function of the judicial office is a critical factor. The analysis ought to be the same regardless of how the judge judges. When an appellate judge--who must function with other appellate judges to accomplish the judicial task--serves the same jurisdictional area as that which defines the electorate, section 2 does not allow a single member subdistricting remedy to be applied. This is so because no intradistrict or intrastate violation of section 2 is possible. The collegial nature of the appellate office in no way alters the compulsion for due process neutrality. When this neutrality is coupled with congruence of jurisdiction and electorate, they jointly assure equality in voting practices and procedures, negate representation and eliminate the possibility of vote dilution.
 
 
 66
 However, as with my partial agreement with Judge Gee's analysis, agreement with Judge Higginbotham should not be taken as controlling fact situations not before us here. The single-judge, trial-court functional analysis proceeds solely on what the judge does and the way he does it. These analyses change no basic principles. If the coincidence of voter residence and jurisdiction does not exist, the same possible vote dilution violations mentioned above, which have nothing to do with the function of the office being voted on, could occur. The importance of the policy embodied in section 2 compels me to say that these limits must be placed on what we write so that future courts will not cut short the intended reach of section 2. In my view, the majority view should be limited to the facts before us.
 
 
 67
 With the reservations expressed, I respectfully concur in reversing the judgment appealed from.
 
 
 68
 HIGGINBOTHAM, Circuit Judge, with whom, POLITZ, KING and DAVIS, join, concurring in the judgment.* JOHNSON, Circuit Judge, concurs in Part 1. WIENER, Circuit Judge, specially concurs in Part 2 in addition to concurring in the majority opinion.
 
 
 69
 This is a voting rights suit challenging the election of district judges on a county-wide basis in Texas. The suit was filed in a United States District Court by the League of United Latin American Citizens against the Attorney General of Texas, the Secretary of State, and other state officials, seeking a declaratory judgment that the at-large election of state district judges in nine targeted counties is illegal under Section 2 of the Voting Rights Act, 42 U.S.C. Sec. 1973, and violative of the fourteenth and fifteenth amendments of the United States Constitution. Plaintiffs requested the district court to enjoin further elections and to impose a districting scheme that included single-member districts. Texas has 254 counties, but the suit attacked only Harris, Dallas, Tarrant, Bexar, Travis, Jefferson, Lubbock, Ector, and Midland Counties.[1] These nine counties have more than one district judge elected county-wide, and elect 172 of the state's 390 district judges. As we will explain, the suit targets Texas law requiring election of a state district judge from a district no smaller than the county, the geographical area of its jurisdiction.
 
 
 70
 After a bench trial, the district court found violations of the Voting Rights Act in each of the nine counties, but rejected the constitutional arguments, finding that plaintiffs had failed to prove that the electoral system was instituted or maintained with discriminatory intent. On January 2, 1990, the district court enjoined defendants from
 
 
 71
 Calling, holding, supervising and certifying elections for state district judges in Harris, Dallas, Tarrant, Bexar, Travis, Jefferson, Lubbock, Hector and Midland Counties under the current at-large system with an order for interim relief.
 
 
 72
 The district court divided the nine counties into electoral sub-districts, tracing the districts of state representatives and the precinct lines of County Commissioners or Justices of the Peace. The district court's order affected 115 of the 172 district courts. The district court also ordered a non-partisan election for May 5, 1990, with any run-off to be held on June 2, 1990. We stayed the district court's order pending this appeal.
 
 
 73
 Defendants first argue that the Voting Rights Act as amended in 1982 has no application to the election of judges. This argument rests on the assertion that the use by Congress of the word "representatives" in Section 2(b), added by amendment in 1982 and popularly known as the Dole compromise, unambiguously excluded elected judges because elected judges are not representatives. This argument in its broadest form--Section 2 of the Act has no application to any judicial elections--was rejected by this court in Chisom v. Edwards, 839 F.2d 1056 (5th Cir.), cert. denied sub nom. Roemer v. Chisom, 488 U.S. 955, 109 S.Ct. 390, 102 L.Ed.2d 379 (1988). The panel opinion was unanimous. The petition for rehearing en banc was denied without a single member of the court requesting a poll. Relatedly, but with less sweep, defendants argue that Section 2(b) has no application to state district judges because such judges do their judging singly and not as part of a collegial body. Finally, defendants attack the findings below as well as the ordered remedy. In addition to quarrels with the sufficiency of proof that the votes of minorities were diluted, defendants argue that the findings are flawed by the erroneous legal conclusion that the contribution of partisan voting to election outcomes is not relevant.
 
 
 74
 We are unpersuaded that Chisom 's decision regarding the election of appellate judges was incorrect, but are persuaded that Section 2(b) will not support this attack upon the countywide election of trial judges. Because we would decide the case on this ground we do not reach defendants' other contentions.
 
 I.
 A.
 
 75
 We are pointed to no evidence of how the Framers' viewed elected judges. This is not surprising; judges were not elected at the time the Constitution was written and ratified. The thirteen original states employed various methods of judicial selection, seven using appointment by the legislature, five by governor and council, and one by governor and legislature. See Winters, Selection of Judges--an Historical Introduction, 44 Tex.L.Rev. 1081, 1082 (1966). Electing judges was a Jacksonian reform aimed at making judicial selection more democratic:
 
 
 76
 Popular sovereignty and popular control of public affairs through the elective system were hallmarks of the Jacksonian era, and, not surprisingly, the movement for popular election of judges dates from this period. Dissatisfaction with the judiciary was widespread among Jacksonians. It arose from several factors including a general disaffection with the legal profession, abuses in the judicial appointment systems, and a feeling, carried over from the Jeffersonian period, that the courts were basically undemocratic. Consequently, the abolition of tenure during good behavior and the adoption of the elective system were advocated as reform measures and were hailed as in accord with the egalitarian spirit of the times.
 
 
 77
 Note, The Equal Population Principle: Does It Apply to Elected Judges?, 47 Notre Dame L.Rev. 316, 317 (1971).
 
 
 78
 The first judicial elections took place as early as 1812 for Georgia lower court judges, Ga. Const. art. III, Sec. 4 (1812), and in 1832 Mississippi adopted a completely elective judiciary. Miss. Const. art. IV, Secs. 2, 11, 16 (1832). When it joined the Union, Texas ironically became the first new state to adopt the federal method of selecting judges, by executive appointment with confirmation by the state senate. Id.; Tex. Const. art. IV, Section 5 (1845). The wholesale change from appointed to elected judges can be marked by New York's adoption of judicial elections in 1846. N.Y. Const. art. VI, Secs. 2, 4, 12, 14 (1846). All new states entering the union after that date, until the entrance of Alaska in 1958, used elections as their method of judicial selection, and Georgia, Maryland, Virginia, and Pennsylvania switched from appointment to election. Winters, Selection of Judges, 44 Tex.L.Rev. at 1082. In short, it is fair to conclude that electing judges was viewed as being more democratic and as a way of ensuring that judges remained sensitive to the concerns of the people.
 
 
 79
 It is vigorously argued that Section 2 of the Voting Rights Act has no application to judicial elections because judges are not representatives. The argument in its strongest form is that the word "representatives," found in Section 2(b), unambiguously excludes judges because judges have no constituents. The argument continues that there is no occasion for exploring legislative history because the inquiry ends with the plain words of the statute. While drawing the language of Section 2(b) from White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), Congress substituted the word "representatives" for "legislators," at the least to insure it reached elected executive officials. This much defendants do not deny. Rather, they argue that although "representatives" may encompass executive officials, Congress intended that the term not encompass judges.
 
 
 80
 To be unambiguously inapplicable to judges, the word "representatives" must be certain of only one relevant meaning and that meaning must exclude judges. Defendants must concede, however, that at one level of generality judges are representatives. The history of electing judges and the political impulses behind that choice are powerful evidence of considered decisions to keep judges sensitive to the concerns of the people and responsive to their changing will. This reality belies the bold assertion that judges are in no sense representatives. The assertion that judges are not representatives actually masks a concern that judges should not be representatives. This is a choice left to the states. Convinced that direct accountability insures that judges represent the people in their judicial tasks, Texas has chosen to elect judges.
 
 
 81
 Judges are oath bound to obey the law and to make decisions in an impartial manner but that does not mean that they are in no practical sense representatives of the people. Yet, executive officials, who are considered representatives, are bound by the same oath. While judges are indeed far removed from the logrolling give and take of the legislative and even executive processes, the effort to assure "sensitivity" and "accountability" through elections is no more than an insistence that the judges represent the people in their task of deciding cases and expounding the law. State judges, wearing their common law hats, face decisions such as whether to adopt a comparative fault standard, and in doing so represent the people in a very real sense. At least at this level of generality judges are indisputably representatives of voters. Saying so in no way steps on the equally indisputable difference between judges and other representatives--that judges do not represent a specific constituency.
 
 
 82
 It is true that judges do not carry the views of a certain group of people into a larger governmental body, attempting to sway that body toward decisions favorable to their constituency.[2] That is not the necessary role of a representative. We extoll the virtues of the jury in criminal cases--the jury is said to be the representatives of the people. Both judicial opinions and academic writings describe members of juries as representatives. See Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 3176, 82 L.Ed.2d 340 (1984); Gillers, Deciding Who Dies, 129 U.Pa.L.Rev. 1, 63-65 (1980); H. Kalven & H. Zeisel, The American Jury 436 (1966). The examples can be multiplied, but the point is plain. The conclusion that the word "representative" has the singular meaning of legislator is nothing more than an effort to substitute judicial will for that of Congress. It is an undisguised effort by judges to claim for judges an exemption from the Voting Rights Act. This exercise of raw judicial power claims, for federal courts, power belonging to Congress and to the states. Texas has decided to elect its judges and Congress has decided to protect the rights of voters in those elections.
 
 
 83
 In sum, we cannot determine whether Section 2(b) of the Voting Rights Act applies to judicial elections by looking only to the word "representative." Rather, we must look to the context in which the word is used and legislative history, cautious as we must be over that enterprise. Exploration of this context requires that we determine whether in using the word representative in the 1982 amendments, Congress intended to withdraw the Act's existing coverage of judicial elections. That is, the freight the majority's use of representative must bear becomes enormous if, before the 1982 amendments, the Voting Rights Act reached judicial elections.[3]
 
 
 84
 We therefore turn first to whether the Voting Rights Act covered judicial elections before 1982. We consider the 1982 amendments to the Act and review the legislative history of the amendments. We then turn to the question whether Congress was required to mention specifically the election of judges in the statute. The resolution of this question is informed by application of settled principles of federalism; we determine that the election of judges has no claim to the protections of federalism not shared by other institutions of state government. We next reject the argument that because the one-person, one-vote principle is inapplicable to the judiciary, racial vote-dilution claims under Section 2 must be inapplicable as well. Finally, we look at the interplay of Sections 2 and 5 to determine whether differences between the two sections preclude the application of Section 2 to judicial elections despite Section 5's coverage of those same elections, and conclude that they do not.
 
 B.
 
 85
 Section 2, before the 1982 amendments, provided as follows:
 
 
 86
 Sec. 1973. Denial or abridgement of right to vote on account of race or color through voting qualifications or prerequisites.
 
 
 87
 No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title.
 
 
 88
 42 U.S.C. Sec. 1973 (1975).
 
 
 89
 Section 2 by its express terms reached state judicial elections. "Vote" or "voting" was defined as including "all action necessary to make a vote effective in any primary, special or general election ... with respect to candidates for public or party office and propositions for which votes are received in an election." 42 U.S.C. Sec. 1973l (c)(1). There was no mention of judges or the judiciary. There also was no mention of any other specific office. Judges are "candidates for public or party office" elected in a "primary, special, or general election." Congress intended to reach all types of elections, rather than to pick and choose. Indeed, even votes on propositions are within the purview of the Act. Section 14(c)(1), 42 U.S.C. Sec. 1973l (c)(1).
 
 
 90
 Defendants argue that the Act is silent as to judges, so it must be construed as not including judicial elections. They argue that, while judges in Texas are "candidates for public office," it is uncertain whether Congress, by providing a broad definition of "vote," also intended to create a private remedial cause of action of similar scope in Section 2. Congress expressly defined the term "vote" or "voting," however, and nothing suggests that Congress did not intend that definition to apply throughout the Act, including Section 2.
 
 
 91
 Congress intended that its 1965 Act provide protection coextensive with the Constitution. Justice Stewart reiterated this in City of Mobile v. Bolden:
 
 
 92
 [I]t is apparent that the language of section 2 no more than elaborates upon that of the Fifteenth Amendment, and the sparse legislative history of section 2 makes clear that it was intended to have an effect no different from that of the Fifteenth Amendment itself....
 
 
 93
 446 U.S. 55, 60-61, 100 S.Ct. 1490, 1495-1496, 64 L.Ed.2d 47 (1980). We reject the implicit suggestion that the protections of the Fifteenth Amendment do not extend to minorities whose right to vote in judicial elections is abridged. The Fifteenth Amendment applies to all elections, and Congress intended the Voting Rights Act of 1965 to apply to all elections.
 
 
 94
 By its terms the 1965 Act included judicial elections. Under defendants' argument then the word representative in Section 2(b) must bear the burden of being the sole means by which Congress in the 1982 amendments exempted judicial elections from the Act's coverage. The record is bereft of any hint that Congress's effort in 1982 to expand the Voting Rights Act carried a sub rosa withdrawal of coverage for state judicial elections.
 
 C.
 
 95
 Congress amended Section 2 in 1982 in partial response to the Supreme Court's decision in City of Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 2758, 92 L.Ed.2d 25 (1986). Bolden held that in order to establish a violation under Section 2 of the Act a plaintiff must prove purposeful racial discrimination. Bolden, 446 U.S. at 66, 100 S.Ct. at 1499. Congress incorporated a "results test" into Section 2(a) to diminish the burden of proof necessary to prove a violation. Congress also added Section 2(b), which codified the legal standards enunciated in White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).[4] As amended in 1982, Section 2 now provides:
 
 
 96
 (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.
 
 
 97
 (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
 
 
 98
 42 U.S.C. Sec. 1973 (1982).
 
 
 99
 The plain language of Section 2(a) reaches judicial elections, using the same broad language as the 1965 Act, referring generally to "voting" and "vote," the definitions of which continued unchanged under the 1982 amendments. The legislative history of the 1982 amendments does not indicate that the terms "vote" or "voting" do not include judicial elections, or that "candidates for public office" does not include judges. While retaining the identical statutory reach, Congress added the word "results" as the measure of violation. The word representative does not appear in subsection (a).
 
 
 100
 Section 2(b) is a new section added in the 1982 amendments. Section 2(a) refers to "denial or abridgement of the right ... to vote on account of race or color ..., as provided in subsection (b) of this section." Section 2(a) anticipates that subsection (b) will define how a violation of subsection (a) can be established. Other than the previously discussed vague use of the word "representative," there is no reason to suppose that subsection (b), defining a type of proof sufficient under Section 2, was meant to withdraw all coverage from judicial elections. Before we turn to the legislative history of the 1982 amendments for evidence of intent to exclude judicial elections from coverage, we pause to emphasize that the exercise is itself not necessary. A straightforward reading of both Sections 2(a) and 2(b) leaves little doubt but that Section 2(a)'s broad reach was never intended to be limited by use of the word representative in the explanation in Section 2(b) of how a violation might be shown.
 
 
 101
 Congress used the word "candidates" interchangeably with "representatives" in the legislative history. There was no indication that "representatives" was intended to have a limited meaning, applying only to legislative and executive officials, but not to elected members of the judiciary. Even Senator Dole, who proposed the language of compromise in Section 2, stated
 
 
 102
 Citizens of all races are entitled to have an equal chance of electing candidates of their choice, but if they are fairly afforded that opportunity, and lose, the law should offer no redress.
 
 
 103
 S.Rep. No. 417, 97th Cong., 2d Sess. 193 (Additional Views of Senator Robert Dole), reprinted in 1982 U.S.Code Cong. & Admin.News 177, 364 (emphasis added), and
 
 
 104
 [T]he standard is whether the political processes are equally "open" in that members of a protected class have the same opportunity as others to participate in the political process and to elect candidates of their choice.
 
 
 105
 Id. (emphasis added).
 
 
 106
 In the one place where the judiciary is specifically mentioned in the legislative history of the 1982 amendments, the report of the subcommittee on the Constitution states that the term " 'political subdivision' encompasses all governmental units, including city and county councils, school boards, judicial districts, utility districts, as well as state legislatures." Report of the Subcommittee on the Constitution of the Committee of the Judiciary, S.Rep. 417, 97th Cong., 2d Sess., reprinted in 1982 U.S.Code Cong. & Admin.News 177, 323 (emphasis added). Of course, a brief statement in a subcommittee report opposing the amendments is not much. Nonetheless, the proponents of the changes to the Act did not contest this description, although they would have had incentive to do so to alleviate any fears of such extended coverage if such a broad scope of applicability were not intended.
 
 
 107
 The Senate and House hearings regarding the 1982 amendments contain various references to judicial elections, primarily in the context of statistics presented to Congress indicating the progress made by minorities under the Act up to that date. The charts indicated when minorities were elected to office, and included judicial election results. See Extension of the Voting Rights Act: Hearings on H.R. 1407, H.R. 1731, H.R. 3112, H.R. 3198, H.R. 3473 and H.R. 3498 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary, 97th Cong. 1st Sess. 38, 193, 239, 280, 502, 574, 804, 937, 1182, 1188, 1515, 1528, 1535, 1745, 1839, 2647 (1981); Voting Rights Act: Hearings on S. 53, S. 1761, S. 1975, S. 1992, and H.R. 3112 Before the Subcomm. on the Constitution of the Senate Comm. on the Judiciary, 97th Cong. 2d Sess. 669, 748, 788-89 (1982).
 
 
 108
 To summarize, the relevant legislative history concerning the 1982 amendments suggests that Section 2(b) was intended to reach all elections, including judicial elections. There is no hint that Congress intended to withdraw coverage.
 
 
 109
 But, it is argued, even if other aspects of Voting Rights law do apply to judicial elections, vote-dilution claims should not, because these claims are a new and fundamentally different ground for relief under amended Section 2 and because anti-dilution remedies are particularly intrusive on the judiciary. Therefore, the argument continues, had Congress intended the Act to apply to judicial elections, it should have said so explicitly, which it did not. We reject this argument that Congress singled out both judicial elections and dilution claims for distinct treatment. In plain language it argues that Congress affirmatively turned its head away from the dilution of minority votes in judicial elections.
 
 
 110
 The first flaw in this argument is that vote-dilution claims were not newly authorized by amended Section 2. There were many vote dilution cases before 1982. The statutory prohibition of vote dilution by the Voting Rights Act is as old as the Act itself. It was first raised as early as 1965, the year of the Act's inception, when the Supreme Court observed that
 
 
 111
 [i]t might well be that, designedly or otherwise, a multi-member constituency apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or political elements of the voting population. When this is demonstrated it will be time enough to consider whether the system still passes constitutional muster.
 
 
 112
 Fortson v. Dorsey, 379 U.S. 433, 439, 85 S.Ct. 498, 501, 13 L.Ed.2d 401 (1965). Vote-dilution claims were considered in Burns v. Richardson, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966), and Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), where the plaintiffs were unsuccessful, and in White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir.1973) (en banc), aff'd sub nom. East Carroll Parish School Board v. Marshall, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), where the plaintiffs prevailed. These cases were decided under the results test. Finally Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), where the Supreme Court articulated the intent standard, was a dilution case. The 1965 Act, therefore, was considered to prohibit vote dilution as well as more straightforward denials of the right to vote. By its terms the act covered judicial elections. The 1982 amendments simply made it clear that results and not intent were the basis for finding a violation. However difficult in application the results test may have proved to be, the amendments to Section 2 did not themselves create a vote-dilution claim. To the contrary, the dilution of the voting strength of minorities was the accepted premise of the debate. Indeed Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir.1973) (en banc), the source of the "senate factors" that became part of the congressionally required inquiry was a dilution case.
 
 
 113
 Much of the legislative history of the 1982 amendments indicates that Congress intended to return to pre-Bolden standards and was not otherwise reaching for a new and more intrusive private cause of action. As we will explain, at least Senator Hatch feared the language of the 1982 amendment would be much more intrusive, expressing concern that its uncertainty would lead to proportional representation. His fear was fueled by the restoration of the results test, however, not dilution theory, which had been part of the voting rights law for at least seventeen years.
 
 
 114
 The principal focus of the House debates centered on Section 5, but the Senate debates were centered on the meaning of the Section 2 amendments. Nonetheless, there was some discussion in the House, and at least some witnesses argued that "the amended Section 2 ... would restore to black Southerners the right to challenge alleged discriminatory election schemes which were developing before Mobile, [and that] notwithstanding the Court's claim to the contrary in Mobile, the intent test first became a constitutional standard in 1976 with Washington v. Davis, an employment case." Boyd & Markman, The 1982 Amendments to the Voting Rights Act: A Legislative History, 40 Wash. & Lee L.Rev. 1347, 1366 (citing comments by James Blacksher and David Walbert). Congressman Sensenbrenner argued that the Rodino amendment to Section 2 was necessary in order to clarify the standard of proof required in order to establish violations of the Act. 127 Cong.Rec. H6850 (daily ed. Oct. 1981) at H6983.
 
 
 115
 In the Senate Report on the Amendments the purpose of the bill was stated as
 
 
 116
 designed to make clear that proof of discriminatory intent is not required to establish a violation of Section 2. It thereby restores the legal standards based upon the controlling Supreme Court precedents, which applied in voting discrimination claims prior to the litigation involved in Mobile v. Bolden. The amendment also adds a new subsection to Section 2 which delineates the legal standards under the results test by codifying the leading pre-Bolden vote dilution case, White v. Regester.
 
 
 117
 S.Rep. 417, 97th Cong., 2d Sess., reprinted in 1982 U.S.Code Cong. & Admin.News at 179 (emphasis added).
 
 
 118
 Senator Hatch opposed the change, arguing that it "would redefine the concept of 'discrimination' and would 'transform the Fifteenth Amendment and the Voting Rights Act from provisions designed to ensure equal access and equal opportunity in the electoral process to those designed to ensure equal outcome and equal success.' " Boyd, Voting Rights Act Amendments, 40 Wash. & Lee L.Rev. at 1389 (quoting Hearings on the Voting Rights Act Before the Senate Subcommittee on the Constitution of the Committee on the Judiciary, 97th Cong., 2d Sess. 3 (1982)). But, Senator Mathias, a proponent of the bill, argued that
 
 
 119
 [t]he House amendment is needed to clarify the burden of proof in voting discrimination cases and to remove the uncertainty caused by the failure of the Supreme Court to articulate a clear standard in the City of Mobile v. Bolden.... We are not trying to overrule the Court. The Court seems to be in some error about what the legislative intent was.... Prior to Bolden, a violation in voting discrimination cases [could] be shown by reference to a variety of factors that, when taken together, added up to a finding of illegal discrimination. But in Bolden, the plurality appears to have abandoned this totality of circumstances approach and to have replaced it with a requirement of specific evidence of intent ... this is a requirement of a smoking gun, and I think it becomes a crippling blow to the overall effectiveness of the Act.
 
 
 120
 Hearings on the Voting Rights Act Before the Senate Subcommittee on the Constitution of the Committee on the Judiciary, 97th Cong., 2d Sess. 3, 199 (1982).
 
 
 121
 Senator Hatch persisted that the results test represented a new test, but supporters of the bill took issue with this view. Laughlin McDonald of the ACLU argued that "[p]rior to Mobile, it was understood by lawyers trying these cases and by the judges who were hearing them that a violation of voting rights could be made out upon proof of a bad purpose or effect ... Mobile had a dramatic effect on our cases." Id. at 369. Defenders of the amendment assumed that the results test represented a restatement of the law prior to Bolden.
 
 
 122
 Critics of the results test argued that even if the lower federal courts had adopted a results test in their pre-Bolden interpretation of Section 2, the original intent of Congress had been the establishment of a test in Section 2 using the traditional standard of intent or purpose. Boyd, Voting Rights Act Amendments, 40 Wash. & Lee L.Rev. at 1405 (citing Appendix to Additional Views by Senator Hatch, S.Rep. No. 417, 97th Cong., 2d Sess. 36 (1982)). Proponents responded by arguing that there was no evidence that Congress meant an intent test to apply. The Senate Report of the Committee on the Judiciary adopted this view, citing Attorney General Katzenbach's testimony during the hearings on the Voting Rights Act of 1965 to the effect that "Section 2 would ban 'any kind of practice ... if its purpose or effect was to deny or abridge the right to vote on account of race or color." S.Rep. 417, 97th Cong., 2d Sess., reprinted in 1982 U.S.Code Cong. & Admin.News at 194 (citing Hearings on S. 1564 before the Committee on the Judiciary, 89th Cong., 1st Sess., 191 (1965)).
 
 
 123
 This legislative history generally indicates an intent to retain pre-Bolden standards rather than create a more intrusive new cause of action.[5] We have insisted in other contexts that Congress clearly state its intent to supplant traditional state prerogatives. Judicial insistence upon clear statement is an important interpretative tool vindicating concern for separation of powers and federalism. See Atascadero State Hospital v. Scanlon, 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985); Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (Pennhurst II ). This insistence upon "an unequivocal expression of congressional intent," Pennhurst II, 465 U.S. at 99, 104 S.Ct. at 907, is based upon the fundamental nature of the interests at stake, Atascadero, 105 S.Ct. at 3147 ("The 'constitutionally mandated balance of power' between the states and the Federal Government was adopted by the Framers to ensure the protection of 'our fundamental liberties.' ") (quoting Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 572, 105 S.Ct. 1005, 1028 (Powell, J., dissenting)). These mighty principles do not carry us very far here. Congress has clearly expressed the Act's application to the states, and has clearly expressed its intent that violations of the Act be determined by a results test rather than an intent standard. By these actions, the Act, with all of its intrusive effect, has been made to apply to the states. Significantly, the "results tests" did apply to all elections including judicial elections until the 1980 decision of Mobile v. Bolden, supra. Thus, intrusive as it is, the Act, including the anti-dilution provisions, applied to judges before the 1982 amendment. The suggestion that anti-dilution and results tests were introduced by the 1982 amendments is wrong.
 
 
 124
 The majority's argument is by necessity a demand for the exemption of judicial elections from the Act as a whole. We cannot recognize this broad exemption.[6] Section 5, commonly seen as the most far reaching of the Voting Act provisions, see South Carolina v. Katzenbach, 383 U.S. 301, 358-62, 86 S.Ct. 803, 833-35, 15 L.Ed.2d 769 (1966) (Black, J., dissenting), has allowed no escape for elected state judiciaries. Haith v. Martin, 618 F.Supp. 410 (E.D.N.C.1985), aff'd mem., 477 U.S. 901, 106 S.Ct. 3268, 91 L.Ed.2d 559 (1986). As an inferior court we are bound by the holding of the Supreme Court that judicial elections are covered by Section 5 of the Act, a result explicitly urged by then Solicitor General Charles Fried and by then head of the Civil Rights Division, Assistant Attorney General William Bradford Reynolds. The same officials argued in Chisom that amended Section 2 of the Act is equally applicable, as does the present administration.
 
 D.
 
 125
 Finally, it is argued that an elected state judiciary is somehow free of the anti-dilution prohibitions of the Voting Rights Act but remains subject to its other strictures. The argument has two premises: First, because the pre-Bolden anti-dilution cases did not involve judicial elections, Section 2's prohibition against vote dilution does not extend to judicial elections; second, because the one-person, one-vote principle has been held not to apply to judicial elections, vote-dilution claims under Section 2 do not apply either.
 
 
 126
 The first premise is obviously flawed. Nothing in the pre-Bolden cases suggests that the prohibition against vote dilution does not apply to judicial elections. That those cases involved elections of officials other than judges was happenstance; cases involving judicial elections simply had not yet come up. Furthermore, the statutory language cannot be parsed to read that judicial elections are not subject to dilution claims, but are subject to the remaining strictures of Section 2. This is so even if representative is found to mean elected members of the legislative and executive branches but not the judicial branches of state government. Further, concluding that Section 2 does not apply would create the anomaly that Section 5, conceded to reach elected judges, and Section 2 use identical language to define their reach. Section 2 either applies in its entirety or not at all and defendants' efforts to soften the full force of their extraordinary contention must fail.
 
 
 127
 The second premise--that because the one-person, one-vote principle does not apply to judicial elections, the vote-dilution prohibition does not either--must also fail. The prohibition of geographical discrimination in voting expressed in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), commonly referred to as the one-person, one-vote principle, was held not to apply to the apportionment of state judiciaries in Wells v. Edwards, 347 F.Supp. 453 (M.D.La.1972) (3-judge court), aff'd mem., 409 U.S. 1095, 93 S.Ct. 904, 34 L.Ed.2d 679 (1973) (three justices, dissenting). It is argued that vote-dilution principles cannot be applied to an elected judiciary because the one-man, one-vote principle does not apply, and without requiring equal apportionment there is no benchmark for concluding that there is vote dilution. This argument rests upon the equating of racial and non-racial acts by the state that deny voting strength. Yet they measure equality on quite different planes. One is facially neutral in the matter of race; indeed compliance may adversely affect black voting power. The other rests on core concerns of the Civil War amendments--submerging of minority voting strength by the combined force of election methods and bigotry. In the more concrete terms of this case, that the state has chosen to allot thirty-some judges to Dallas County and only one to another county is not relevant. Submerging votes of protected minorities by a cohesive white majority is relevant.
 
 
 128
 It is perverse now to reason that because the elections of state judges are free of the Reynolds' command of numerical equality, an elected judiciary is a fortiori free from the racial equality commands of the Civil War Amendments and the Voting Rights Act. It is perverse because even the defenders of the "political thicket" doctrine at all times maintained that the courts must hold to the core values of the Civil War Amendments. For example, Justice Frankfurter, in his famous dissent to the Court's entry into the political thicket in Baker v. Carr admitted, joined by Justice Harlan, that "explicit and clear constitutional imperatives guided judicial intervention in state government on the issue of black disenfranchisement." Baker v. Carr, 369 U.S. 186, 285-86, 82 S.Ct. 691, 747-48, 7 L.Ed.2d 663 (1962) (Frankfurter, J., dissenting).
 
 
 129
 The courts have struggled to develop a measure of dilution stemming from the combination of racial voting patterns and state election practices. Gingles itself was the first detailing of that enterprise by the Supreme Court. At earlier times, various justices have referred to our efforts to do so in Zimmer v. McKeithen as amorphous. But, this difficulty has nothing to do with the inapplicability of the command of numerical equality, nor is its difficulty peculiar to judicial elections. We remind that the effort in this case to measure the submerging of black and Hispanic voting power begins with a system that is numerically perfect--county-wide elections.
 
 
 130
 We are pointed to several lower court opinions stating that judges are not "representatives."[7] These cases held that the prohibition against geographical discrimination does not reach judicial elections. The argument is that because many of these courts held that judges are not "representatives," Congress must have meant a similar exclusion in its use of the word. We disagree. Words come to their full meaning in context. This argument of incorporated definition is unsupported by a trace of legislative history and is no more than an assertion. Indeed we showed above that Congress meant "representative" to include judges for the purposes of the Voting Rights Act. The Reynolds principle is race neutral, different, as we observed, from the race-based focus of the Voting Rights Act. However problematic locating the principle of one-person, one-vote in the fourteenth amendment may be, race-based concerns are at its core. Nothing in policy or logic suggests that declining to extend the Reynolds principle to judicial elections carries any sway in freeing judicial elections from race-focused concerns.
 
 
 131
 Wells was distinguished from cases challenging election practices in Lefkovits v. State Board of Elections, 400 F.Supp. 1005 (N.D.Ill.1975) (3-judge court), aff'd mem., 424 U.S. 901, 96 S.Ct. 1092, 47 L.Ed.2d 306 (1976), where the court stated:
 
 
 132
 [W]hen a judge is to be elected or retained, regardless of the scheme of apportionment, the equal protection clause requires that every qualified elector be given an equal opportunity to vote and have his vote counted.
 
 
 133
 Id. at 1012. This was the precise point made by Solicitor General Fried in his successful argument to the Supreme Court that it should summarily affirm Haith v. Martin.
 
 
 134
 In Haith the district court held that judicial elections are covered by Section 5 and the preclearance requirements of the Act. The district court found, using an analysis similar to that used by this circuit in Voter Information Project v. Baton Rouge, 612 F.2d 208 (5th Cir.1980), that although the one-person, one-vote principle may not apply to judicial elections, claims with respect to the Voting Rights Act do not deal with numerical apportionment, but with discrimination. The court held that "the Act applies to all voting without any limitation as to who, or what, is the object of the vote." 618 F.Supp. at 413.[8] In short, Haith rejects the suggestion that inapplicability of the Reynolds principle is any barrier to the application of the Voting Rights Act. We are bound by Haith, and the relevance of that bind turns on whether Section 5, dealt with in Haith, and Section 2 are coextensive in their application to the judicial elections. We turn now to that question.
 
 E.
 
 135
 Defendants have raised no compelling reason to distinguish between Section 5 and Section 2 with respect to their applicability to judicial elections. To distinguish the Sections would lead to the incongruous result that if a jurisdiction had a discriminatory voting procedure in place with respect to judicial elections it could not be challenged, but if the state sought to introduce that very procedure as a change from existing procedures, it would be subject to Section 5 preclearance and could not be implemented. Sections 2 and 5 operate in tandem, with Section 2 prohibiting the continued use of discriminatory practices, and Section 5 preventing the imposition of new discriminatory practices to replace those condemned in those areas subject to preclearance. Section 5 contains language defining its scope that is almost identical to the language in Section 2: "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting...."
 
 
 136
 There are important differences in the two sections, however. Section 5 requires preclearance of any new voting practices and procedures, and, in determining whether or not a new practice is entitled to preclearance, only the effect of the new practice is considered. City of Lockhart v. United States, 460 U.S. 125, 103 S.Ct. 998, 74 L.Ed.2d 863 (1983); Beer v. United States, 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976). This has been described as a retrogression test, with preclearance denied only if the new practice has a retrogressive effect, rather than a results test, for the effects of the existing system on minorities are not considered. Thus in Section 2 the entire scheme of voting practices and procedures is considered to see whether it results in less than an equal opportunity to participate in the political process, whereas under Section 5 only the effects of new practices and procedures are considered. Section 2 is, therefore, arguably more intrusive than Section 5,[9] for Section 5 only regulates whether or not changes may be implemented, whereas Section 2, if a violation is found, can lead to the dismantling of an entire system of voting practices that may have been in place for many years. This is a distinction between the two sections, but our question must be whether the difference means that Section 5 applies to judicial elections, but Section 2 does not. There appears to be no relevant reason why judicial elections are so different from legislative or executive elections that both sections should apply to one and not the other.
 
 
 137
 The Voting Rights Act plainly covered judicial elections before the 1982 amendments. It is equally plain that there is little evidence that Congress intended any retrenchment by its 1982 amendments. In sum, defendants are left with the unconvincing argument that the changes of the 1982 amendments were fundamental in ways unique to judicial elections. Certainly, the Voting Rights Act intrudes heavily into state matters but it is no more specifically intrusive in judicial elections than in any others. We would hold that Section 2 of the Voting Rights Act applies to judicial elections.
 
 II.
 
 138
 We now turn to the quarrel with the county-wide election of Texas trial judges. The Voting Rights Act does not purport to change the choices by a state of the duties and means for their discharge it gives to a particular office it chooses to create. Rather, the Act accepts these state creatures but patrols for impermissible vote dilution of minority voting power caused by the features of the election process in combination with racially molded voting patterns in any election of such officials. The statute, however, gives no right to choose how the combination will be broken. It is important, then, that we keep in mind that the analysis of Thornburg v. Gingles is relevant only to an inquiry into whether an at-large election impermissibly dilutes minority voting strength; it is not a way of assessing every claimed vote dilution.
 
 
 139
 Texas has structured its government such that it wields judicial power at the trial level through trial judges acting separately, with a coterminous or linked electoral and jurisdictional base, each exercising the sum of judicial power at that level, and all with review by courts acting collegially. We are persuaded that, for purposes of the Voting Rights Act, because the fact and appearance of independence and fairness are so central to the judicial task, a state may structure its judicial offices to assure their presence when the means chosen are undeniably directly tailored to the objective. The choice of means by Texas here--tying elective base and jurisdiction--defines the very manner by which Texas' judicial services are delivered at the trial court level. These means define the office. Nothing in the Voting Rights Act grants federal courts the power to tamper with these choices. It requires no narrow reading to conclude that the statute does not by its terms purport to do more. Stated in traditional Fourteenth-Amendment terms, there is compelling necessity sufficient to overcome the strict scrutiny of state acts impinging upon a fundamental interest. We would not lightly suppose that the Voting Rights Act reached further than the Civil Rights Amendments except for dispensing with the requirement of purposeful violation.
 
 
 140
 It follows that inquiry into the Section 2 claims proceeds by accepting that trial judges are officials exercising the full authority of their positions alone whose full authority has its source in the electors from a district coterminous with their jurisdiction. There can be no dilution of votes for a single judge because each judge holds a complete judicial office. This feature of the trial judge will alone decide this case but, as we will explain, we need not rest only on this proposition. Rather, that the trial judges act singly is also integral to the linking of jurisdiction and elective base.
 
 A.
 
 141
 The district courts are the primary trial courts in Texas. Indeed, the constitution of the Republic of Texas provided:
 
 
 142
 The Republic of Texas shall be divided into convenient judicial districts, not less than three, nor more than eight. There shall be appointed for each district a judge, who shall reside in the same, and hold the courts at such times and places as Congress may by law direct.
 
 
 143
 Guittard, Court Reform, Texas Style, 21 Sw. L.J. 451, 456 (1967). The first state constitution, adopted in 1845, contained essentially the same provision in article IV, section 6. This provision was amended in 1850 to allow for the election of district judges by the people, but the subsequent constitution of 1861 provided that district judges were to be appointed. Tex. Const. art. V, Sec. 7, interpretive commentary (1876, amended 1985). Texas constitutions adopted since 1861, including the current constitution, which was adopted in 1876, have provided for elected district judges.
 
 
 144
 All the constitutions have provided that the district courts are to be held by district judges chosen from defined districts, following the pattern of the Constitution of the Republic of Texas. Although in the Constitution of the Republic of Texas the number of district courts was limited to not more than eight, subsequent constitutions have left the number of courts to the legislature. All Texas constitutions, including the current one, before it was amended in 1985, suggested that each district would be served by only one judge. See Tex. Const. art. V, Sec. 7 (1876, amended 1985) ("[f]or each district there shall be elected ... a Judge...."). A one judge per district system, however, presupposes districts of substantially equal population. Guittard, supra at 456. Thus, with the growth of the population in certain counties it became necessary for the legislature to make adjustments.
 
 
 145
 The system challenged in this case was set up according to this pattern. See Tex. Gov't Code Secs. 24.001-.954 (Vernon 1988 & Supp.1990). With the exception of the 72nd district, each challenged judicial district in the nine targeted counties is coextensive with one county. The 72nd district is composed of two counties. Id. Sec. 24.174 (Vernon 1988). Since 1907 district judges have been elected county-wide. In 1985, however, a section was added to article V of the 1876 Constitution which specifically allows the creation of judicial districts smaller than a county. Tex. Const. art. V, Sec. 7a(i) (1985). A majority of the voters in the county must authorize the division. Id. This power has yet to be exercised.[10]
 
 
 146
 The district courts in multi-district counties were unified for certain administrative purposes in 1939 through the passage of the Special Practice Act, which is now, for the most part, found in Tex.R.Civ.P. 330(e)-(i). Guittard, supra at 457-58. The relevant parts of the Special Practice Act essentially provide that cases can be freely transferred between judges and that any judge can work on any part of a case including preliminary matters. Also, "[a]ny judgment rendered or action taken by any judge in any of said courts in the county shall be valid and binding." Tex.R.Civ.P. 330(h).
 
 
 147
 The Administrative Judicial Act, originally passed in 1927 and subsequently amended on several occasions, divides Texas into nine administrative regions, each with a presiding judge appointed by the governor with the advice and consent of the senate. See Tex. Gov't Code Secs. 74.005, .042 (Vernon 1988). The "presiding administrative judge is the key administrative officer in the Texas judicial system." Guittard, supra at 459. He is empowered to assign judges as necessary within his region. Id. Secs. 74.052-056 (Vernon 1988 & Supp.1990); see also Judicial Administration Rule 8 (Vernon 1988 & Supp.1990). He is required to call two meetings of all judges in his administrative region each year and any other meetings as necessary. Tex. Gov't Code Sec. 74.048(a) (Vernon 1988); Judicial Administration Rule 4 (Vernon 1988 & Supp.1990). This conference is for "consultation and counseling concerning the state of the civil and criminal business" and is empowered to promulgate administrative rules, rules governing the order of trials and county-wide recordkeeping, and other rules deemed necessary. Tex. Gov't Code Sec. 74.048(b)-(c) (Vernon 1988).
 
 
 148
 The local administrative judge is elected by a majority vote of all the judges in the county, including both district and statutory judges. Id. Sec. 74.091 (Vernon 1988 & Supp.1990). His duties on the county level are similar to those of the presiding administrative judge. See id. Sec. 74.092. The local administrative judge has the power to assign judges within his county. Id. Sec. 74.094. Under the leadership of the local administrative judge, the district and statutory judges in each county are directed to adopt local rules of administration. Id. Sec. 74.093. These rules must provide for, among other things, the "assignment, docketing, transfer, and hearing of all cases" and "fair and equitable division of caseloads." Id. Sec. 74.094(b); see also Judicial Administration Rule 9(b) (Vernon 1988 & Supp.1990). All local rules, of course, must be consistent with state and regional rules. Judicial Administration Rule 10 (Vernon 1988). In this regard, the present Chief Justice of Texas testified at trial that the only collegial decision-making by district judges in a county is in the handling of some administrative matters.
 
 B.
 
 149
 A distinction was drawn between multi-member and single-member structures in Butts v. City of New York, 779 F.2d 141 (2d Cir.1985), cert. denied, 478 U.S. 1021, 106 S.Ct. 3335, 92 L.Ed.2d 740 (1986). In that case the plaintiffs contested a primary run-off law, contending that it violated the Equal Protection Clause and the Voting Rights Act. The Second Circuit noted that one of the ways that a class of citizens may have less opportunity to participate is when there are electoral arrangements that diminish a class's opportunity to elect representatives in proportion to its numbers. The court distinguished, however, between multi-member bodies, where at-large elections may produce this result, and elections for single-member offices. Butts, 779 F.2d at 148. The court found that the Supreme Court had made this distinction implicit in City of Port Arthur v. United States, 459 U.S. 159, 103 S.Ct. 530, 74 L.Ed.2d 334 (1982), where the Supreme Court struck down a run-off requirement for seats on a multi-member city council, but did not mention the run-off requirement for mayor. The Eleventh Circuit followed Butts in United States v. Dallas County, Ala., 850 F.2d 1430 (11th Cir.1988), in holding that "the at-large election of the probate judge is permissible under the Voting Rights Act with respect to the judicial aspects of that office." Id. at 1432 n. 1.
 
 
 150
 The positions at issue in Butts and Dallas County, and the position not considered in Port Arthur, were what can be viewed as traditional single member offices, i.e., mayor, city council president, single probate judge, or comptroller. There was only one of each office in a given geographical area, and no problem with overlapping jurisdictions. Here, there are many judges with overlapping jurisdictions. Nonetheless, each acts alone in wielding judicial power, and once cases are assigned there is no overlap in decision-making.
 
 
 151
 Indeed there are special courts created within some judicial districts that emphasize the single-member nature of the offices, for not all of the judges handle the same type of work. Some are courts of general jurisdiction, but some judges are elected specifically to handle juvenile cases, or family law cases, or criminal cases. To that extent they are separate offices, just as county treasurer and sheriff are different positions. Of course, many of the judges do handle the same type of cases and the cases are assigned to any of these judges within a given geographical jurisdiction. There are many of them within a geographical area, and the plaintiffs would find this dispositive. A United States district court in Alabama has held that Alabama trial courts similar to the Texas courts are multi-member positions.[11] Southern Christian Leadership Conf. v. Siegelman, 714 F.Supp. 511 (M.D.Ala.1989). The court considered Dallas County and Butts, but concluded that
 
 
 152
 Although neither court expressly defined the term "single-member office," it is clear to this court that the phrase, as used in those cases, refers to a situation where under no circumstances will there ever be more than one such position in a particular geographic voting area.
 
 
 153
 Siegelman, 714 F.Supp. at 518.
 
 
 154
 The court found that exclusive authority alone does not define single-member official. Id. We disagree with this view of multi-member versus single-member office and agree with the argument made by defendants in Siegelman that
 
 
 155
 the hallmark of a single member office, as [the Butts and Dillard v. Crenshaw County, 831 F.2d 246 (11th Cir.1987) ] courts use the term, is not the fact that the office is traditionally held by only one individual but, more importantly, the fact that the full authority of that office is exercised exclusively by one individual.
 
 
 156
 714 F.Supp. at 518.
 
 
 157
 Viewing district judges as members of a multi-member body is flawed in concept. Before any suits are filed, before any cases are assigned, there is a group of judges with concurrent jurisdiction, and plaintiffs maintain that this group should have minority members, so that minorities' views and concerns are considered by the judges who decide important issues in their lives. The problem is that once a case is assigned, it is decided by only one judge. The other judges have absolutely no say over the disposition of that case, and no influence over the deciding judge. One commentator has described the Texas system as a "one-judge, one court organization at the trial level, with rigid jurisdictional lines and with each judge largely independent of any supervisory control, except by way of appellate review." Guittard, Court Reform Texas Style, 21 Sw. L.J. at 455.
 
 C.
 
 158
 It is implicit in Gingles that the effect of election practices must be considered after taking the underlying definition of the offices of state government as given. Even the sharply divided Gingles Court agreed that its inquiries were only into the legality of at-large methods of electing representatives to a larger governing body. Section 2 does not grant federal courts the authority to disregard the states' basic arrangements. We would not rest on inference to support such a grant of authority. It would run counter to fundamental concepts of federalism:
 
 
 159
 As broad as the congressional enforcement power is [under the fifteenth amendment], it is not unlimited. Specifically, ... the power granted to Congress was not intended to strip the States of their power to govern themselves or to convert our national government of enumerated powers into a central government of unrestrained authority over every inch of the whole Nation.
 
 
 160
 Oregon v. Mitchell, 400 U.S. 112, 128, 91 S.Ct. 260, 266, 27 L.Ed.2d 272 (1970).
 
 
 161
 The State of Texas has chosen to have trial judges who wield full judicial authority alone, a structure we must accept. Subdistricting would not create an equal opportunity for representation in decision-making, for
 
 
 162
 [t]here can be no equal opportunity for representation within an office filled by one person. Whereas, in an election to a multi-member body, a minority class has an opportunity to secure a share of representation equal to that of other classes by electing its members from districts in which it is dominant, there is no such thing as a "share" of a single-member office.
 
 
 163
 Butts, 779 F.2d at 148. What subdistricting does, rather than provide minorities with representation in all decisions, is to simply allocate judges, and thus judicial decisions, among various population groups. The Voting Rights Act does not authorize such allocation. It cannot be made to authorize allocating judges by simply restating the office of district judge as a shared office or by asserting that the "function" of an office is not relevant. Saying that district judges in fact share a common office that can be subdistricted does not make it so. Nor does the assertion that function is not relevant make sense. Function is relevant to the threshold question of what features of the state arrangement define the office.
 
 
 164
 These judges all hear and decide their own docket of cases, and their character as single-office holders instead of members of a multi-member body is emphasized by the problems inherent in attempting to break the linkage of jurisdiction and elective base. To do so may well lessen minority influence instead of increase it, surely not what Congress intended when it enacted the Voting Rights Act or its amendments. The current system of electing district judges at least permits voters to vote for each and every judicial position within a given district, generally a county. It is more likely, therefore, that minority voters will have some influence on the election of each judge. Under the district court's order, each voter would have the opportunity to vote for only one judge in each district, the judge whose position was assigned to the subdivision. At the same time, a minority litigant will be assigned at random to appear before any district judge in the county. Under the district court's orders it is much more likely than not that a minority litigant will be assigned to appear before a judge who is not elected from a voting district with greater than 50% minority population. Instead, the great majority of district judges will be elected from new voting subdistricts with negligible minority populations and, consequently, negligible minority political influence on the outcome of those elections. Under the new order requiring election of judges from subdistricts, 9 of the 59 judicial positions in Harris county would be elected from minority-dominated subdivisions. Minority voters would have very little influence over the election of the other 50 judges, for the minority population is concentrated in those 9 subdivisions. When minority members are litigants, however, they would not necessarily appeal before one of the judges elected from a minority-dominated subdivision. Instead, a minority member would have an 84.75% chance of appearing before a judge who has little direct political interest in being responsive to minority concerns.[12] The minority member would have a 98.3% chance of appearing before a judge in whose election he had not been able to vote. This is not like the situation in Chisom, where the judges were all part of one body, and every case that went to the Louisiana Supreme Court was heard by all of the judges, so every individual litigant from the state of Louisiana was assured that a judge for whom he had an opportunity to vote would hear his case.
 
 
 165
 Requiring subdistricting for purposes of electing district judges, unlike other offices, would change the structure of the government because it would change the nature of the decision-making body and diminish the appearance if not fact of its judicial independence--a core element of a judicial office. Trial judges would still exercise their full authority alone, but that authority would no longer come from the entire electorate within their jurisdictional area. Subdistricting would result in decisions being made for the county as a whole by judges representing only a small fraction of the electorate. This does not occur when members of larger bodies are elected from subdistricts, for when the body makes a decision, the interests of all electors are still represented in each decision. When the decisions are not made by a group, the nature of the decision-making body as representative of all of the electors is fundamentally changed through subdistricting. The State of Texas has struck for the essential and defining quality of independence by defining the office of trial judge as a person who judges singly and whose power is derived from an electoral base equal to jurisdictional base. Trial judges are not members of a multi-member body, although there are many district judges, for the district judges do not decide cases as a body. Disregarding the state's insisted linkage of elective base and jurisdiction for single office holders by subdistricting or ignoring their discrete activity, causes a fundamental change in the very office of district judge, a result not contemplated by the Voting Rights Act. These elements define the office; they are far more than the "manner" of election.
 
 
 166
 One can view the single-official doctrine as being no more than a statement of the mechanical impossibility of gaining greater representation for minorities. This approach is simply a resignation to the reality that if there is only one official, there can only be an at-large election. A second view is that the single official exception expresses far more. This view recognizes that we must accept the state's definition of the office, and that where functions are singly exercised, providing single-member districts is no more than proportional representation in its most superficial form.
 
 
 167
 Some district courts have proceeded with the first view, concluding that the single official doctrine is inapplicable where more than one official was elected at-large by the same electorate. It is plain that this entire suit rests upon the premise that the single official exception reflects no more than the reality that there is nothing to divide unless there is more than one judge in a single county. It is no accident that this suit attacks only the nine counties with multiple district judges and minority populations. But, the right secured to minorities under Section 2 of the Voting Rights Act to not have their vote diluted is expressed in the assertion that their interests are to be represented in governmental decisions. Where judges make their decisions alone, electing judges from single member districts only increases the likelihood that a small number of governmental decisions will be influenced by minority interests, while minority interests will not be represented at all in the majority of judicial decisions. In this way subdistricting would work a fundamental change in the scheme of self governance chosen by the state of Texas, for it would change the authority behind the decisionmaking body of the Texas courts--and in doing so it would retard, not advance the goals of the Voting Rights Act.
 
 
 168
 In sum, the single-official concept as we apply it here, whatever its full import in other contexts, is no more than a specific application of the basic principle that analysis under the Voting Rights Act proceeds without changing the state's definition of the office. With the judges acting alone, each judge the decision-making body, a coterminous electoral and jurisdictional base is a core component of the office. Subdistricting would change that office in ways wholly different from changing the selection of members of a governing body as distinguished from the body itself.
 
 D.
 
 169
 Plaintiffs argue that the state's interest in linking jurisdiction and elective base is weakened because in 1985 Texas granted authority to counties to provide for the election of district judges from smaller geographical units. There are two difficulties with this argument. First, no county has elected to do so, and, second, the change only allows the creation of districts smaller than a county. It does not purport to authorize the election of district judges with countywide jurisdiction from districts smaller than the county.
 
 
 170
 It is also suggested that there is no unacceptable appearance of bias (translate, you still have a court of law) in the prosecution of claims where one litigant is a constituent of a district judge and the other is not. The argument continues that such a circumstance is presented where one of the parties is from another county. This suggestion ignores the fact that the state recognized that elimination of this risk and appearance of bias was essential to the office it was creating by an elaborate set of rules controlling venue. Indeed, Texas has perhaps the most developed venue practice of any of the states, doubtlessly attributable to its diversity and size, allowing a mini-trial of venue facts. Whether a trial proceeds in the plaintiff's home county in El Paso or a defendant's home county in Dallas is of great moment. In sum, the intercounty bias argument proves, rather than defeats, the point. Avoiding the fact and appearance of bias is a powerful state interest. There is no corresponding system of venue rules for a subdistricted county. Rather, as we explained, the state insists on linking the elective and jurisdictional base. Texas wants a trial judge, not a partisan. We are persuaded that Texas has a compelling interest in linking jurisdiction and elective base for judges acting alone. By definition there can be no dilution from the county-wide election of such single officials.
 
 JOHNSON, Circuit Judge, dissenting:
 Introduction
 
 171
 Let it be clear at the outset: this case presents compelling allegations of racial discrimination brought under the United States Voting Rights Act by black and Hispanic minorities. Congress intended the Voting Rights Act to be a key measure in its efforts to erase a haunting legacy of racial discrimination in the United States. The majority and concurring opinions in this case, in reasoning inconsistent with this Court's long history of progressive and enlightened interpretation of civil rights legislation,[1] seriously cripple this congressional intent. Despite unmistakable congressional statements concerning the broad scope of the Voting Rights Act, the majority and concurring opinions have taken different directions to achieve the same result: they deny minority groups the right to challenge discriminatory practices in judicial elections.
 
 
 172
 The majority opinion is completely isolated. No previous court has ever even suggested that judicial elections might be exempt from the reach of Section 2 of the Voting Rights Act. To the contrary, this Court, the United States Court of Appeals for the Fifth Circuit, had earlier concluded that Section 2 applied to all elections, including judicial elections. Not only does the majority opinion reverse this two year old precedent, but it also demonstrates a shocking lack of concern for the urgently argued position of the Attorney General, who has consistently maintained that the Voting Rights Act reaches all elections. The majority's isolated opinion stands as a burning scar on the flesh of the Voting Rights Act; the majority opinion is not simply wrong, it is dangerous.
 
 
 173
 Judge Higginbotham's concurring opinion ("the concurrence") is scarcely removed from the majority opinion. Like the majority opinion, the concurrence is wholly inconsistent with the reasoned decisions of numerous courts and the established position of the Attorney General. The concurrence purports to rely upon compelling precedent from another federal court. But in truth, the concurrence is entirely premised upon a single case that is not authority for the concurring opinion's eccentric holding. The scar the concurrence would leave on the Voting Rights Act is no less injurious than that the majority inflicts; the concurrence is not only wrong, it too is dangerous.
 
 
 174
 Several truths are self-evident from the clear language of the statute that had heretofore opened the electoral process to people of all colors. The Voting Rights Act focuses on the voter, not the elected official. The Act was intended to prohibit racial discrimination in all voting, the sole inquiry being whether the political processes are equally open to all persons, no matter their race or color. The Act is concerned only with the intent of persons of "race or color" in casting a ballot; it has no interest in the function of the person holding the office. Yet, the majority and concurring judges carve out a sweeping exception to the Act's intended scope, concluding that the Voting Rights Act does not apply to judicial elections (or at least some judicial elections). I refuse to join my fellow judges' purposeful and calculated deprivation of the Voting Rights Act's ability to eliminate racial discrimination in the electoral process.
 
 I.
 THE MAJORITY OPINION
 
 175
 In 1988 this Court handed down its decision in Chisom v. Edwards, 839 F.2d 1056 (5th Cir.), cert. denied sub nom. Roemer v. Chisom, 488 U.S. 955, 109 S.Ct. 390, 102 L.Ed.2d 379 (1988), which held that Section 2 of the Voting Rights Act applies to judicial elections. Today, in an opinion that mutilates familiar precepts of statutory construction,[2] the majority rudely abandons the Chisom precedent.[3] The majority, concluding that the Act does not apply to any judicial election, delivers a devastating blow to the Act's continuing ability to eliminate racial discrimination in voting. At this stage, there is little reason to revisit in detail Judge Higginbotham's refutation of the majority's attack on Chisom v. Edwards. It is sufficient simply to reiterate a few essential--and well established--points.
 
 
 176
 Congress enacted the Voting Rights Act in 1965 "to rid the country of racial discrimination in voting." South Carolina v. Katzenbach, 383 U.S. 301, 315, 86 S.Ct. 803, 812, 15 L.Ed.2d 769 (1966). Since the inception of the Act, the Supreme Court has consistently interpreted the Act in a manner which affords it "the broadest possible scope" in combatting racial discrimination. Allen v. State Board of Elections, 393 U.S. 544, 567, 89 S.Ct. 817, 832-33, 22 L.Ed.2d 1 (1969). Other courts, including this Court, have followed the Supreme Court's lead. See, e.g., Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir.1973) (en banc), aff'd sub nom. East Carroll Parish School Board v. Marshall, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) (per curiam). As a consequence, the Voting Rights Act regulates a wide range of voting practices and procedures. See United States v. Board of Commissioners, 435 U.S. 110, 122-23, 98 S.Ct. 965, 974-75, 55 L.Ed.2d 148 (1978).
 
 
 177
 For a resolution of the instant case, it is unnecessary to look beyond Section 14(c)(1) of the Voting Rights Act, which defines the salient word "voting" and describes the range of election practices that are encompassed within the regulatory sphere of the Act:
 
 
 178
 The terms "vote" or "voting" shall include all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this subchapter or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election.
 
 
 179
 42 U.S.C. Sec. 1973l (1982) (emphasis added). Can this language in the Act itself be ignored? It is indisputable that Texas' elected judges are "candidates for public or party office." Thus, by its express terms, the Voting Rights Act applies to state judicial elections. Indeed, this is the only result consistent with the plain language of the Act.
 
 
 180
 Nonetheless, relying on a restrictive definition of the single word "representative" in Section 2 of the Act, the majority determines that the Voting Rights Act does not necessarily apply to all "candidates for public or party office." Such a conclusion breaches several established canons of statutory construction. The majority's restrictive definition of "representative" violates the requirement that remedial legislation such as the Voting Rights Act be broadly construed. See Allen, 393 U.S. at 565, 89 S.Ct. at 831-32. The majority's reliance on an isolated term violates the requirement that a reviewing court examine a statute in its entirety. See Duke v. University of Texas at El Paso, 663 F.2d 522, 525 (1981), cert. denied, 469 U.S. 982, 105 S.Ct. 386, 83 L.Ed.2d 320 (1984).
 
 
 181
 Moreover, the majority's awkward decision violates the requirement that a reviewing court avoid statutory interpretations that lead to an absurd or inconsistent result. See United States v. Turkette, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). As just one example of the majority opinion's troubled logic, consider the majority's crude attempt to distinguish judges from other elected officials. The majority repeatedly urges that judges are not "representatives" within the comprehension of the Voting Rights Act because judges are not advocates; that is, judges "speak for and to the entire community, never for segments of it and still less for particular individuals." Majority Opinion at 628 (emphasis in original). Yet, at the same time, the majority recognizes that this Court has already found that many other elected officials are "representatives," officials who also cannot fairly be described as advocates for segments of the community or particular individuals. Majority Opinion at 630 n. 14. A county sheriff or court clerk, for example, speaks for and to the entire community--is responsible for and to the entire community. If a county sheriff or court clerk, as with a judge, attempted to act in a partisan manner, that person would be grossly deficient in his or her duties.
 
 
 182
 It should be clear by this point that the majority's decision is less an attempt to interpret congressional intent concerning the reach of the Voting Rights Act, and more an attempt to effectuate the majority's policy determination that state judicial elections should be immune from federal congressional interference. Perhaps the strongest evidence of the majority's desire to supplant the stated aims of Congress with its own policy preferences is its conspicuously casual treatment of the position of the United States Attorney General. In United States v. Board of Commissioners, 435 U.S. at 131, 98 S.Ct. at 979, the Supreme Court concluded that the Attorney General's interpretation of the Voting Rights Act is persuasive evidence of the original congressional understanding of the Act, "especially in light of the extensive role the Attorney General played in drafting the statute and explaining its operation to Congress." Id. In the present case, the Attorney General has filed an amicus curiae brief which maintains that the scope of Section 2 of the Voting Rights Act reaches all elections, including judicial elections. But remarkably, the majority dismisses the Attorney General's position, noting simply that it does not seem to "weigh very heavily in the scales." Majority Opinion at 630.
 
 
 183
 The application of Section 2 should depend solely on the fact of nomination or election. As the Eleventh Circuit--a Circuit which shares this Court's long tradition of enlightened enforcement of federal civil rights legislation--has noted, "[n]owhere in the language of Section 2 nor in the legislative history does Congress condition the applicability of Section 2 on the function performed by an elected official." Dillard v. Crenshaw County, 831 F.2d 246, 250-51 (11th Cir.1987) (emphasis added). By exempting an entire class of elected officials from Section 2 simply on the basis of their judicial function, the majority has not only inextricably placed this Court at odds with the conclusions of other circuits, but also has struck a devastating blow to the Voting Rights Act's ability to alleviate racial discrimination in the voting process.
 
 II.
 THE CONCURRENCE
 
 184
 Judge Higginbotham's concurring opinion concludes, and I agree, that the Voting Rights Act applies to judicial elections. The concurrence, however, is itself seriously flawed. Critical examination of the concurring opinion's construction of the single office holder exception reveals the error:[4] the concurrence's creative interpretation of the Voting Rights Act would result in the per se exclusion from the reach of the Voting Rights Act of elections for the greatest part of the judiciary--state district court judges. In a troubling display of judicial intervention, the concurrence's result-oriented opinion fails to acknowledge the clear purpose of the Act evidenced in its language and legislative history.
 
 
 185
 In adopting the Civil War amendments, Congress was propelled by a concern for the emasculation of minority voting strength through the puissant coupling of bigotry with state supported election practices.[5] Similarly, a century later, Congress enacted the Voting Rights Act for the broad purpose of eradicating racial discrimination in voting across the length and breadth of this nation.[6] In 1982 amendments to the Act, Congress strengthened the Act's promise to ensure minorities equal access to the political process. The Senate Report accompanying the 1982 amendments indicates that the Voting Rights Act was designed not only to correct active discrimination, but to "deal with the accumulation of discrimination." Senate Report Accompanying the 1982 Amendments to the Voting Rights Act at 5, 1982 U.S.Code Cong. & Admin.News at 182. Especially in light of the history and language of the Act, it is axiomatic that the relevant inquiry centers on the voter --specifically, the minority voter--not on the elected official. The Act is, after all, the Voting Rights Act.
 
 Section 2 and the Judiciary
 
 186
 The majority opinion concludes that state district court judges are not "representatives" within the comprehension of Section 2 of the Voting Rights Act. However, as the concurrence aptly notes, the term "representative" in Section 2 is not synonymous with "legislator." Congress intended the Voting Rights Act to prohibit and alleviate discrimination in all voting, a term which Congress defined to include any action necessary to make a vote effective in any election with respect to any candidate for public or party office.[7] From the language of the Act as a whole, it is clear that the term "representative" corresponds with the term "candidate." It is also clear that a contestant in a judicial election is a candidate for public office. Thus, the language and reasoning of the concurring opinion is sound to the limited extent it urges that neither the words nor the legislative history of the Act indicate any intention on the part of Congress to exempt judicial elections from coverage.
 
 
 187
 This Court has previously addressed the question of the Act's application to judicial elections. In Chisom v. Edwards, a case which examined the application of Section 2 in the context of a challenge to Louisiana's system of electing state supreme court justices, a panel of this Court held that Section 2 applies with equal force to judicial elections. As in the concurring opinion in the instant case, the outcome in Chisom hinged upon an examination of both the plain language and the legislative history of the Act.
 
 
 188
 Despite a basic agreement with this Court's earlier analysis in Chisom, the concurrence here attempts to shift the focus of the Voting Rights Act from the minority voter to the elected official. This Court recognized in Chisom that the term "representative" for purposes of the Voting Rights Act may be defined as anyone selected by popular election from a field of candidates to fill an office.[8] The definition of "representative" in Chisom intertwines with the statute's definitions of "vote" and "voting" and assures the Act's application to all elections. The concurrence in the present case, however, subtly constricts this definition. While acknowledging that Congress used the terms "candidate" and "representative" interchangeably when drafting the Act, the concurrence nonetheless reasons that the "effect of election practices must be considered after taking the underlying definition of the offices of state government as given." Concurring Opinion at 649 (emphasis added). Stressing that the district judge is not of nature "responsive," the concurrence concludes that the Voting Rights Act does not apply to elections for trial judges. The concurrence attempts to precipitously limit the scope of the Act's remedial provisions, emphasizing the position of the office-holder over the status of the voter. The anticipated responsive nature of a particular office (or office holder) is of absolutely no consequence to the initial and dispositive question of whether the office is filled through the use of an electoral process.[9]The Minority Voter
 
 
 189
 Despite Congress' clear statement that the Voting Rights Act applies to all voting, the concurrence, through rhetoric surrounding the term "representative," attempts to shift attention from the one casting a vote to the one for whom the vote is cast. Not one word or thought contained in Section 2(a) or (b) supports, or is suggested by the concurrence in support, of this effort. The Voting Rights Act was designed to eradicate discrimination in voting, and the essential inquiry is whether the political processes leading to the casting of the ballot are equally open to all persons, no matter what their race or color.
 
 
 190
 Nothing in the language of Section 2 suggests that a reviewing court should concentrate on the type of election under dispute--whether it is for a mayor, an alderman, a legislator, a constable, a judge or any other kind of elected official.[10] Rather, the sole focus of Section 2 is the minority voter--specifically, whether the minority voter has been allowed the opportunity to participate fully in the democratic process.
 
 
 191
 Nowhere in the language of Section 2 nor in the legislative history does Congress condition the applicability of Section 2 on the function performed by an elected official.... Once a post is open to the electorate, ... if it is shown that the context of that election creates a discriminatory but corrigible election practice, it must be open in a way that allows racial groups to participate equally.
 
 
 192
 Dillard v. Crenshaw County, 831 F.2d 246, 250-51 (11th Cir.1987).[11]
 
 
 193
 The instant case reveals an electoral scheme which is "discriminatory but corrigible." Whenever a number of officials with similar functions are elected from within a discrete geographic area, there exists the inherent potential for vote dilution. The concurrence, however, ignores this verifiable fact, and concludes that, because the full authority of the elected position is exercised exclusively by one individual, there can be no impermissible dilution of the minority vote.
 
 
 194
 The Voting Rights Act is not concerned with the power and authority vested in the elected office. It is the value and efficacy of the political process accorded the voter, not the office holder, which is secured by statute. The Supreme Court's decision in Thornburg v. Gingles[12] stressed Congressional concern over the submergence of minority votes as a result of significant white bloc voting. The express language of Section 2(b), which looks only to the "political processes leading to nomination or election" and to whether minority members "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice," emphasizes this Congressional concern on the voter and not the elected official. Congress focused in Section 2 on the elimination of discrimination in voting (thus the title of the Act), and on the creation of minority opportunities for electoral success. See Gingles, 478 U.S. 30, 48, 106 S.Ct. 2752, 2765, 92 L.Ed.2d 25 (1986); Haith v. Martin, 618 F.Supp. 410, 413 (E.D.N.C.1985), aff'd, 477 U.S. 901, 106 S.Ct. 3268, 91 L.Ed.2d 559 (1986) (the Act applies "to all voting without any limitation as to who, or what, is the object of the vote") (emphasis in original).
 
 
 195
 The concurrence asserts that the essential right secured to minorities under Section 2 is the right to have "their interests ... represented in governmental decisions." Concurring Opinion at 651. In this way, the concurrence bolsters its argument that creating smaller districts in multi-seat counties would create a perverse result by lessening "minority influence" over the decisions reached in lawsuits. Going further afield, the concurrence expresses concern that under a system such as that authorized in the district court's interim plan, there is a high probability that a minority voter appearing in court will have his or her case heard by a judge whom he or she had no hand in electing.
 
 
 196
 The concurrence's discussion approaches the perceived problem from the wrong end;[13] again, quite simply, the focus should be on the rights of the voter, not the litigant. The essential inquiry is whether the minority vote is diluted--whether minority citizens have an equal chance of electing candidates of their choice. As the concurrence acknowledges, the standard is whether the political processes are equally open to participation. The focus of the 1982 legislative history of the Act, the 1985 amendment, and Gingles is on electoral opportunities and success.
 
 
 197
 The concurrence refuses to acknowledge the preeminence, within the context of the Voting Rights Act, of the efficacy of the minority vote. The concurrence notes that, because all registered voters in the county vote for all the judges, "minority voters will have some influence on the election of each judge." Concurring Opinion at 649. This statement entirely avoids the issue: the instant case is before this Court because minority voters have asserted and proven that any influence they may potentially have as a cohesive voice--whether as to the election of one judge or several--is submerged at the ballot box by white bloc voting.
 
 
 198
 Even more disturbing, however, is the concurrence's confusion of the minority as voter and the minority as litigant. This confusion is best illustrated by the concurrence's concern that, under a single member districting scheme such as that imposed by the federal district court's interim plan, "a minority member would have an 84.75% chance of appearing before a judge who has little direct political interest in being responsive to minority concerns." Id. at 650. The right of minorities to an equal opportunity to elect the candidates of their choice encompasses more far-reaching effects than the statistical probability that a minority litigant will appear before a judge of like race or color.[14] Despite the progress achieved under federal and state civil rights statutes, minorities in this country are far from free of the lingering legacy of racial discrimination, even at the ballot box.
 
 The Function of Function
 
 199
 When juxtaposed against the express language of the Act, a test which requires an examination of the function of the elected official is inherently suspect by virtue of its obvious judicial invention. As one court has emphatically noted,
 
 
 200
 [n]owhere in the 239 pages of the [Senate] Report is there any indication whatsoever that Congress intended the Voting Rights Act to apply to only particular types of elections. Rather, the entire Report indicates ... that the 1982 amendment was intended to effect an expansive application of the Act to state and local elections.
 
 
 201
 Southern Christian Leadership Conference v. Siegelman, 714 F.Supp. 511 (M.D.Ala.1989). The title or duties of an elected office are inconsequential to the fundamental question of whether, due to significant white bloc voting, the votes of a cohesive minority group are consistently submerged and rendered ineffectual to elect the minority's preferred candidate.
 
 
 202
 The concurrence opines that "[f]unction is relevant to the threshold question of what features of the state arrangement define the office." Concurring Opinion at 649. This statement in its broadest sense is undoubtedly true. In the context of the Voting Rights Act, however, the compelling question is at what point that function will be examined. The Act's focus on the minority voter reinforces the proposition that the function of the elected official is only relevant to an examination of whether, under the totality of the circumstances, a Section 2 violation has been established, not whether Section 2 is applicable.
 
 
 203
 To focus primarily on the function of the official during the initial analysis of a Voting Rights Act claim is to ignore the essential inquiry of the Act: "whether, as a result of the challenged practice or structure, the fundamental right of minorities to elect candidates of their choice and to participate equally in the political process has been violated." Senate Report at 28, 1982 U.S.Code Cong. & Admin.News at 205, 206 (emphasis added). The quoted language indicates that, contrary to the concurring opinion's assertions, a reviewing court is not bound to accept a state's governmental plan if that plan in fact results in the illegal submergence of minority votes.[15] If deference to the function of an official were in fact required, courts would have been acting contrary to the law since the very origin of voting rights litigation. Surely the imposition of single member districts in a judicial context treads no more upon a state's electoral scheme than the now familiar court-ordered displacement of well-entrenched at-large election schemes for legislative bodies.[16]Vote Dilution and Single-Member Offices
 
 
 204
 The concurrence, characterizing Texas district court judges as single officeholders,[17] concludes that no violation of Section 2(b) can be shown because "each judge holds a complete judicial office," and there can be no share of such a single-member office. Concurring Opinion at 646. This application of the so-called "single officeholder exception" is entirely without support.
 
 
 205
 The concurrence relies primarily on the Second Circuit's opinion in Butts v. City of New York, 779 F.2d 141 (2d Cir.1985), which examined New York's primary run-off election law. The contested New York law provided that if no candidate for mayor, city council president, or comptroller received more than forty percent of the vote in a party primary, then a run-off election is held between the two candidates receiving the most votes. The district court, concluding that the totality of the circumstances demonstrated a Section 2 violation, found in favor of the minority plaintiffs. The Second Circuit reversed, noting that
 
 
 206
 [t]he concept of a class's impaired opportunity for equal representation [cannot be] ... uncritically transfer[red] from the context of elections for multi-member bodies to that of elections for single-member offices.... [T]here is no such thing as a "share" of a single-member office.
 
 
 207
 Butts, 779 F.2d at 148. The concurring opinion rests squarely--and solely--on this brief passage from Butts; examination of the particular facts in Butts, however, reveals that this passage provides absolutely no support for the concurrence.
 
 
 208
 In Butts, the voting district consisted of a municipality. From this voting district, three positions were filled by election. The three positions were the offices of (1) mayor, (2) city council president, and (3) comptroller. Concluding that it is impossible to capture a "share" of a single member office, the Second Circuit held that the contested electoral law did not trigger a vote dilution analysis and therefore could not violate Section 2(b).[18] The instant case, on the other hand, involves the election of multiple judges to virtually identical positions in one geographic area, with each judge exercising autonomy over his or her particular office. The concurrence incorrectly extends Butts' reasoning to conclude that if minority groups are unable to elect their preferred candidate to these autonomous positions, the result is simply a consequence of the political process and not the result of vote dilution.
 
 
 209
 Butts stands for nothing more than the unremarkable proposition that in certain electoral situations, there exists only one relevant office for the whole electorate. In Butts, one of the offices at issue was the position of mayor. The Second Circuit reasoned that unlike the electorate which selects candidates to fill the legislature, the electorate which selects a candidate to fill the mayoralty cannot be subdivided into districts. In holding that a mayoral election cannot be the basis of a vote dilution claim, Butts thus focuses on the electorate and whether the electorate can be subdivided; it does not focus on the official and whether the official or his office can be subdivided.
 
 
 210
 On a cursory examination of the concurring opinion, its attempted expansion of the Butts rationale might seem plausible. This superficial plausibility, however, is what makes the concurring opinion so dangerous; it has the potential to seduce the unwary into an interpretation of the Voting Rights Act that would frighteningly limit the applicability of the Act. The concurrence's understanding of the "single officeholder exception" is seriously flawed, and must not be allowed to do further damage.
 
 
 211
 In its broadest sense, the concurrence's conception of the "single officeholder exception" states absolutely nothing. Every officeholder is a single officeholder; no position is shared by more than one person. Every officeholder exercises complete authority over the duties of his or her office. To say that a district judge in Texas exercises full responsibility over his office simply does not advance the analysis. Every state legislator exercises full responsibility over his or her office; in that respect the legislator is no different from a judge. Every county sheriff exercises full responsibility over his or her office; in that respect the county sheriff is no different from a judge.
 
 
 212
 The problem with the concurrence's single officeholder analysis is that it misdirects the focus of the inquiry. The question is not whether a judge can be subdivided, as the concurrence posits, but rather whether the judiciary can be subdivided, or more precisely, whether the electorate that selects the members of the judiciary can be fairly subdivided such that the votes of minority voters within the electorate are not submerged in a bloc of white votes. The focus must be on the electorate, and not on the individuals who are chosen by those voters.
 
 
 213
 Nonetheless, in an unprecedented example of judicial creativity, the concurrence attempts to expand the Butts rule by authorizing an examination of a trial court judge's role as a sole decisionmaker.[19] Such an expansion flies in the face of congressional intent that the Act liberally apply to all forms of voting. The concurrence does not do justice to the spirit of the Voting Rights Act by attempting to expand Butts to a situation in which several virtually identical positions are elected by the same electorate to serve the same geographic area.
 
 
 214
 Whether an office-holder wields his power in an individual or collegial manner is simply not the relevant inquiry. Butts, the case on which the concurrence hinges, was not based on a "collegial decisionmaking" rationale, nor was this concept even discussed. The Butts exception is premised simply on the number of officials being elected (one), the unique responsibilities of that office, and the impediment to subdividing that single position so that minority voters have the opportunity to elect a "share." In the instant case, however, this Court is not concerned with the election of one single member position; rather, this Court is concerned with the election, within discrete geographic areas, of as many as fifty-nine judges with virtually identical functions. The instant case is unlike Butts; there is no physical impediment to elections from smaller representative areas.
 
 
 215
 One court has already specifically addressed the problem with which we are faced. In Southern Christian Leadership Conference v. Siegelman, 714 F.Supp. 511 (M.D.Ala.1989), the court rejected the application of Butts to the election of several trial judges from a single county.[20]
 
 
 216
 In effect, the at-large boundaries [in Butts ] coincide with the only "district" boundaries possible; because there is only one position to be filled, it becomes impossible to split up the jurisdiction any smaller. The concept of vote dilution is effectively rendered meaningless and such offices are inappropriate for section 2 vote dilution challenges. There is no such rationale, however, for not applying section 2 to elected positions merely because "the full authority of that office is exercised exclusively by one individual," as the defendants would have this court do.
 
 
 217
 Siegelman, 714 F.Supp. at 519-20 (footnotes omitted).
 
 
 218
 The approach in Siegelman is consistent with the Supreme Court's analysis in Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). In Gingles, the Supreme Court stated that a threshold inquiry in a claim that an at-large election system dilutes minority voting strength is whether there is evidence that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district. "The single-member district is generally the appropriate standard against which to measure minority group potential to elect because it is the smallest political unit from which representatives are elected." Gingles, 478 U.S. at 50 n. 17, 106 S.Ct. at 2766 n. 17. Proof of this geographically compact minority population essentially isolates the at-large electoral structure as the feature which has the potential to deny the minority fair electoral access. The maintenance of an at-large election scheme is not dilutive, however, where the electoral scheme in the relevant jurisdiction is indivisible because there is only one position to be for the particular jurisdiction.
 
 
 219
 Applying this reasoning, I continue to urge the adoption of the Siegelman court's definition of single member office:
 
 
 220
 The true hallmark of a single-member office is that only one position is being filled for an entire geographic area, and the jurisdiction can therefore be divided no smaller. While mayors and sheriffs do indeed "hold single-person offices in Alabama," they do so because there is only one such position for the entire geographic area in which they run for election.... It is irrelevant, in ascertaining the potential existence of vote-dilution, that these officials happen to exercise the full authority of their offices alone.
 
 
 221
 Siegelman, 714 F.Supp. at 518 n. 19 (emphasis original).
 
 
 222
 The Siegelman court is not alone in its approach to a claim of vote dilution. Several courts have found Section 2 violations in cases arising from similar factual situations. For example, in Clark v. Edwards, 725 F.Supp. 285 (M.D.La.1988), the district court assumed that districts with more than one judicial position were properly characterized as multi-member districts. Similarly, in Haith v. Martin, the district court concluded that because North Carolina Superior Court judgeships are "designated seats in multi-member districts, ... they are subject to section 5 preclearance requirements." 618 F.Supp. 410. Quoting the language of Section 2, the Haith court stated that "the Act applies to all voting without any limitation as to who, or what, is the object of the vote." Id. at 413. See also Martin v. Allain, 658 F.Supp. 1183 (S.D.Miss.1987); Williams v. State Board of Elections, 696 F.Supp. 1563 (N.D.Ill.1988).
 
 
 223
 The concurrence, noting that Haith 's focus was preclearance under Section 5 and not the merits of a vote dilution claim under Section 2, discounts this reference to the designation of trial judges as part of a multi-member body. Yet, even while urging that Haith is irrelevant to the instant case because it involves Section 5 preclearance, the concurrence notes that there is no reason to distinguish between Section 5 and Section 2 with "respect to their applicability to judicial elections." Concurring Opinion at 644. The concurrence's conclusion is based on the realization that
 
 
 224
 to distinguish the sections would lead to the incongruous result that if a jurisdiction had a discriminatory voting procedure in place with respect to judicial elections it could not be challenged, but if the state sought to introduce that very procedure as a change from existing procedures, it would be subject to Section 5 preclearance and could not be implemented.
 
 
 225
 Id. The concurrence, while clearly acknowledging the interlocking nature of Section 2 and Section 5, simply exempts from its reasoning those judges who are said not to act collegially; the concurrence's logic is strained and internally inconsistent.
 
 
 226
 A violation of the Voting Rights Act occurs where the challenged system effectively discourages equal participation in the electoral process and lessens the opportunity of minority voters to elect representatives of their choice. Where several officials, performing essentially the same job, are elected at-large from one geographic area, the potential for vote dilution is no less tangible simply because each official acts independently of the others. As the court in Siegelman stated, there exists "no rational reason why the concept of vote dilution cannot, or should not, apply to elected members of the judiciary simply because judges exercise their authority in solitude." 714 F.Supp. at 520.
 
 
 227
 The concurrence attempts to shore up its argument that there can be no dilution of votes for the district judge positions in the instant case by asserting that the independent nature of the trial judge is integral to the linking of jurisdiction and elective base. The concurrence argues that
 
 
 228
 Texas has structured its government such that it wields judicial power at the trial level through trial judges acting separately, with a coterminous or linked electoral and jurisdictional base, each exercising the sum of judicial power at that level, and all with review by courts acting collegially. We are persuaded that, for purposes of the Voting Rights Act, because the fact and appearance of independence and fairness are so central to the judicial task, a state may structure its judicial offices to assure their presence when the means chosen are undeniably directly tailored to the objective. The choice of means by Texas here--tying elective base and jurisdiction--define the very manner by which Texas' judicial services are delivered at the trial court level. These means define the office. Nothing in the Voting Rights Act grants federal courts the power to tamper with these choices.
 
 
 229
 Concurring Opinion at 646. Essentially, the concurrence argues that the union of elective base and jurisdiction defines the very nature of the Texas district judge position. Having posited the Texas office of district judge, the concurrence concludes that there is "compelling necessity sufficient to overcome the strict scrutiny of state acts impinging upon a fundamental interest." Id. at 646. The concurrence's assertions, however, are contrary to the realities of the Texas system. Any modification in the elective base of a judicial district will not destroy the essence of the district judge position any more than have the persistent modifications in the jurisdiction of Texas district courts. It is inconceivable that the remedial imposition of a non-dilutive electoral scheme would have a more than negligible effect on the method by which judges exercise their authority. The concurrence cites no evidence--because there is none--that the very nature of the judicial office will be irreparably damaged by a modification in the elective base. In the absence of such evidence, it can hardly be said that the continued unmodified union of elective base and jurisdiction is a "compelling" state interest which militates against the application of the Voting Rights Act.
 
 
 230
 Undeterred by the obvious irrelevance of the acclaimed union between elective base and jurisdiction, the concurrence urges an additional state interest against the application of the Voting Rights Act--the appearance of judicial impartiality. The concurrence argues that the appearance of impartiality is a defining element of Texas' district judgeships. Again, the concurrence's attempts to manufacture a "compelling" state interest belie its desperation to achieve a result that would not require the displacement of the present electoral scheme. The fact that Texas currently elects judges from county-wide areas in order to promote the appearance of impartiality speaks to the state's interest in retaining the current system; it does not speak to the very definition of the official post. The interest in retaining an appearance of impartiality is a factor which may be considered when, pursuant to Gingles, the totality of the circumstances are examined to determine if a Section 2 violation exists. However, this factor--the appearance of impartiality--is absolutely irrelevant to the preliminary question of the applicability of Section 2.
 
 
 231
 The instant case reveals an electoral scheme which is "discriminatory but corrigible."[21] Each county elects three to fifty-nine district court judges. In each county, all judges have the same authority and exercise the same responsibility. With the exception of specialty courts, all judgeships are essentially fungible; within each specialty, the judgeships are also fungible. Section 2 requires that once correctable vote dilution has been established, it must be eradicated by the implementation of a plan which will "completely remedy"[22] the violation by "fully provid[ing an] equal opportunity for minority citizens to participate and to elect candidates of their choice." S.Rep. at 31, 1982 U.S.Code Cong. & Admin.News at 208.
 
 
 232
 The State's Interest in Retaining the Current System
 
 
 233
 The defendants argue that elections for trial judges present strong state interests in retaining an at-large election system. Even if this contention has merit, the State's asserted interests are relevant only to the inquiries of whether plaintiffs have proven a Section 2 violation under the totality of the circumstances and, if so, what remedy would be most appropriate to alleviate the dilution of minority voting strength, while intruding on state interests only to the extent necessary to accomplish the task.
 
 
 234
 In Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir.1973) (en banc), aff'd sub nom. East Carroll Parish School Board v. Marshall, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) (per curiam), this Court set forth a non-exclusive list of factors to be examined when applying the totality of the circumstances test.[23] In Gingles, the Supreme Court reaffirmed the totality of the circumstances approach to a vote dilution claim. In doing so, the Supreme Court noted that the "factors were derived from the analytical framework of White v. Regester ... as refined and developed by the lower courts, in particular by the Fifth Circuit in Zimmer...." Gingles, 478 U.S. at 36 n. 4, 106 S.Ct. at 2759 n. 4 (citations omitted). The Supreme Court went further than the mere application of the totality test, however, and established a three-part foundation for the proof of a Section 2 vote dilution claim. The minority group must demonstrate first that it is sufficiently large and geographically compact to constitute a majority in a single-member district; second, that the minority is politically cohesive; third, that the majority votes sufficiently as a bloc to usually defeat the minority's preferred candidate. Id. at 50-51, 106 S.Ct. at 2766-67.[24] Once the plaintiffs have satisfied these three threshold requirements, as they did here, the district court proceeds to the totality of the circumstances inquiry.
 
 
 235
 The concurrence in the instant case, however, totally ignores the plaintiffs' successful compliance with the Gingles three-part foundation showing. It is by this ruse that the concurrence never reaches the federal district court's treatment of the vote dilution factors based on its per se exclusion of at-large elections for trial judges from the scope of Section 2(b).[25] It must now be apparent that the concurrence's fundamental basis for denying minority groups the opportunity to challenge their exclusion from the process of judicial self-government is simply that the concurrence finds the concept of subdistricting unappealing as a proposed remedy. The only legitimate point at which to weigh this factor, however, is at the proof and remedy stages, when the countervailing factors of voting discrimination, as initially determined by the district court--including, in particular, the plaintiffs' inability to elect their preferred candidates--may be fully taken into balance.
 
 
 236
 Similarly, the State's interest in retaining an at-large election scheme is a factor to be weighed by a court applying the totality test only after the existence of the threshold Gingles factors has been determined.[26] In the instant case, the State has not articulated so compelling an interest in retaining the existing electoral scheme that the dilution of minority votes should go unremedied.[27]
 
 
 237
 When assessing the point at which a state's articulated interest in retaining the current at-large scheme should be considered, the Supreme Court's acknowledgment that the Senate factors are secondary considerations, behind the three-part Gingles test, is of particular relevance.[28] Specifically, the Supreme Court noted that, while the Senate Report factors "may be relevant to a claim of vote dilution through submergence in multimember districts, unless there is a conjunction of the [three threshold factors], the use of multimember districts generally will not impede the ability of minority voters to elect representatives of their choice." Gingles, 478 U.S. at 48, 106 S.Ct. at 2765. From this language, it is beyond dispute that the Supreme Court has articulated a legal test for vote dilution claims which anticipates a threshold showing only of geographical compactness, political cohesion, and white bloc voting sufficient usually to prevent election of the minority's preferred candidate.[29]
 
 
 238
 The conclusion that a state's interest is properly considered in the second phase of the Gingles analysis is bolstered by the Senate Report's indication that the list "of typical factors is neither comprehensive nor exclusive. While the enumerated factors will often be pertinent to certain types of Sec. 2 violations, particularly to vote dilution claims, other factors may also be relevant and may be considered." Id. at 45, 106 S.Ct. at 2763 (footnote omitted). The Report stresses that no particular factors need be proved and neither the existence nor the nonexistence of a majority of factors dictate the outcome. Rather, the determination of whether the political processes are equally open depends on an evaluation of the relevant political process. It is during this examination of minority access to the relevant jurisdiction's political process that a state's interest in retaining the existing system is particularly relevant.
 
 
 239
 Congress most certainly did not intend to frustrate the important state interest in a fair and impartial judiciary; at the same time, however, Congress expressed the affirmative intent to replace unlawfully dilutive electoral systems with ones in which minorities would have a full and fair opportunity to participate. In enacting Section 2(b) of the Voting Rights Act in 1982, it is clear that Congress was continuing the struggle to make the Act responsive to the needs and aspirations of the nation--to make absolutely certain that the fundamental right of minorities to cast an effective vote for candidates of their choice was not abridged.
 
 
 240
 For these reasons, it is imperative that a court first proceed to determine whether the Gingles three-part test has been met; only then should a court proceed to consider, under the "totality of the circumstances," other relevant factors,[30] including the state interest in maintaining an at-large election system, to determine whether, on balance, the plaintiffs have proved a Section 2 violation.[31]
 
 
 241
 In the instant case, the State asserts the following interests as justification for retaining its dilutive electoral system: (1) ensuring popular accountability by making judges' jurisdiction coterminous with the electoral boundaries; (2) avoiding bias caused by small electoral districts; and (3) preserving the administrative advantages of at-large elections, including the use of specialized courts. The concurrence would not only accept the existence of these interests, but would characterize them as compelling.
 
 
 242
 Accountability: The State has advanced the argument that at-large elections provide greater accountability of the judge to county voters. The Chief Justice of the Texas Supreme Court testified that judges are "accountable to those people who can be hailed [sic] into their court," because people who feel they have been wronged by a particular judge may vote against that judge in the next election. Ostensibly, the district court's interim plan eliminates effective accountability. The concurrence notes that under the district court's interim plan, for example, a minority litigant has "a 98.3% chance of appearing before a judge in whose election he had not been able to vote." Concurring Opinion at 650.
 
 
 243
 The concurrence's argument that judges must be "accountable" to potential litigants is an affront to the judiciary of the State of Texas. An honorable judiciary separated from the influence of others is "indispensable to justice in our society." Canon 1 of the Texas Code of Judicial Conduct (emphasis added). District judges are charged to apply the law, not respond to the expectations of litigants. To say that a district judge must be accountable to litigants is to suggest the unthinkable of great numbers of highly respected, dedicated public servants. Not only is such a suggestion misleading to a public already mystified by the bench and bar, it is offensive to those who have occupied distinguished positions as Texas state district judges in the past, as well as those who now occupy such positions.
 
 
 244
 Even if "accountability" were a legitimate state interest, it is not a compelling reason to justify the current dilutive system. Under the existing system, it is highly probable that a case will be heard outside the county in which a litigant lives. In such a case, at least one--and probably both--of the parties will be appearing before a judge who was elected by a population which does not include that litigant. The argument that judges must remain "accountable" to potential litigants in their courts (nauseous as this straw man specter may be) pales in light of the current Texas venue rules, which frequently require that an out of county resident appear before a judge for whom the litigant neither cast a vote for nor against. Even further, in Texas, parties can agree to give a district court venue over a case not arising in the county. Nipper v. U-Haul Co., 516 S.W.2d 467 (Tex.Civ.App.--Beaumont 1974, no writ).
 
 
 245
 The concurrence argues that Texas' elaborate system of venue rules supports the argument that the State has demonstrated a concern for inter-county bias. However, any interest in ensuring accountability and the appearance of impartiality which may be suggested by the Texas venue scheme is lessened considerably by Texas' characterization of venue challenges as dilatory pleas which, if not raised initially, are waived. In light of such a practice, the state interest cannot be said to be compelling.
 
 
 246
 Aside from the complexities of the Texas venue rules, there are many other occasions when a party may appear before a judge elected by the residents of another county. For example, district court judges are frequently called into other counties to help with docket control. Despite the fact that the county's residents have no recourse against this out-of-county judge at the ballot box, Texas courts have upheld the constitutionality of this practice. See, e.g., Reed v. State, 500 S.W.2d 137 (Tex.Crim.App.1973). Nor is the practice of electing judges from subdistricts without precedent in the state. Texas Justice of the Peace courts, lower level trial courts with jurisdiction over an entire county, are elected from sub-county precincts.[32] Thus, a litigant often may appear before a justice of the peace who lives in the same county as the litigant, but not the same judicial district.
 
 
 247
 Additionally, Texas authorizes the use of retired or senior state district judges, who wield all the powers of their elected and active peers. Such a judge was, of course, at one time elected to that office. Upon retirement, however, that judge while sitting is vested with the complete authority of the office and is not subject to election or reelection. Simply stated, Texas' retired or senior judges contribute greatly to the reduction of court dockets, but they are no longer accountable in any fashion to the electorate. See Tex. Gov't Code Ann. Secs. 75.001-.002 (Vernon 1988).
 
 
 248
 There seems to be no basis in fact for the State's contention that county-wide accountability is essential to the proper selection of district judges, or that any measure of electoral accountability is significantly defeated by dividing the county into smaller electoral districts.
 
 
 249
 A Fair and Impartial Judiciary: Both the State and intervenors put on witnesses who testified that the creation of subdistricts was inadvisable because it could lead to perceptions of judicial bias and undue influence by special interests. Specifically, the witnesses testified that judges elected from smaller districts would be more susceptible to undue influence by organized crime or to pressure by other political sources including special interest groups.
 
 
 250
 The concurrence accepts this argument, and urges in addition that subdistricting "would change the structure of the government because it would change the nature of the decision-making body and diminish the appearance if not the fact worthy of its judicial independence."[33] Concurring Opinion at 650. The concern that a judge elected from a small electorate is more susceptible to improper pressure, however, has not prevented or impeded Texas from creating judgeships in counties with relatively small populations. Texas has 386 district judges. A significant number of these judges are elected from districts of less than 100,000 people; indeed, in some districts, as few as 24,000 to 50,000 people constitute the relevant electorate. Even if Harris County (with a population of 2.5 million people) were divided into as many as fifty-nine subdistricts (the number of district courts of general and special jurisdiction), each district would contain approximately 41,000 people. If Dallas County were divided into thirty-seven subdistricts, each subdistrict would have approximately 42,000 people. In short, even if judicial districts in large counties were subdivided, the resulting subdistricts are unlikely to be smaller than many existing judicial districts in Texas. Consequently, the ostensible state interest against a small electorate in judicial districts has not been shown.
 
 
 251
 Furthermore, Texas law does not reflect the witnesses' fear that subcounty districts are inconsistent with the existence of a fair and impartial judiciary. Justices of the Peace are already elected from areas smaller than a county; in a very extended number of counties, these districts contain smaller populations than the hypothetical subdistricts of Dallas and Harris counties discussed above. For example, the Texas Constitution permits counties with as few as 18,000 people to be divided into four justice of the peace precincts. Tex. Const. art. 5, Sec. 18(a).
 
 
 252
 The foregoing is sufficient to demonstrate the state has no compelling interest in retaining county-wide elections. Even if it were not, it is plainly dispositive that the Texas Constitution was recently amended to give voters the option of electing district judges from subdistricts. See Tex. Const. art. 5, Sec. 7a(i). That no county has yet to implement such an elective scheme does not alter the reality that such a change already has the blessing of the state legislature. In light of this constitutionally authorized electoral scheme, the State cannot now say that it has a compelling interest in not electing district judges from an area smaller than a county.
 
 
 253
 Considering the precedent for the creation of judicial subdistricts, the size of the potential subdistricts, and the lack of any real indication that perceived impropriety would result,[34] the state's asserted interests do not support the continuation of its present dilutive electoral system.
 
 
 254
 Administrative Advantages: The State has cited the administrative advantages of the present system, including the county-wide retention of records, the random assignment of cases to judges within the county and county-wide jury empaneling. There is no reason why an electoral scheme utilizing subdistricts cannot retain each and every one of these administrative features; any remedy which might be imposed in this case need not require that a judge elected from a subcounty area have jurisdiction only over that area. In fact, the interim plan fashioned by the district court in the instant case specifically retained all of the foregoing valid administrative features. Furthermore, even if retention of certain administrative conveniences were not possible under a remedial scheme, that fact cannot justify the continuation of an otherwise racially dilutive electoral process. See Westwego Citizens for Better Gov't v. Westwego, 872 F.2d 1201 (5th Cir.1989).
 
 
 255
 The concurring opinion attempts to place great weight on the interest of the State in retaining the system of "specialty" courts. But there is absolutely no reason why a remedy would be unable to accommodate this interest by retaining these courts of specialized jurisdiction.[35] Most counties which utilize the administrative convenience of specialty courts have several of each court; consequently, a remedy could be formulated which retains the use of such courts.[36] It cannot be gainsaid that the State has almost unlimited flexibility to devise a remedial plan which retains specialty courts and all of the other important government interests while eradicating the dilution of minority voting strength. It is critical that it be understood that the history, the intent, the text and spirit of the Voting Rights Act in general and Section 2 in particular mandates the implementation of just such a remedial electoral scheme.
 
 
 256
 Summary: Taken together, the State's attempt to articulate its interest in retaining the current voting system pales when compared to the clear purpose of the Voting Rights Act. The State has not shown an inalterable policy of not subdividing districts, nor has it shown that judges would be less accountable to the electorate if elected from a subdistrict. Further, there is no indication that any impropriety, real or perceived, on the part of judges elected from smaller units would in fact occur. Finally, while the State may indeed have a legitimate interest in retaining specialty courts, the State has failed to demonstrate why that interest cannot be effectuated in an electoral scheme which does not dilute minority voting strength.
 
 III.
 CONCLUSION
 
 257
 "The Voting Rights Act was designed by Congress to banish the blight of racial discrimination in voting, which has infected the electoral process in parts of our country for nearly a century."[37] It is my most earnest conviction that the majority and concurrence have each chosen erroneous methods to examine the particular specimen of vote dilution asserted by the plaintiffs and found by the district court here. The true method that both have missed has been obscured by their failure to recognize the true meaning of the Voting Rights Act, and by their failure to comply with the strictures of Gingles. The majority, abandoning established precedent, has determined that Section 2 of the Voting Rights Act does not apply to any judicial elections. The concurrence has looked to the function of the elected official, and the duties and powers of the official once in office, to conclude that, because trial judges act independently, at-large elections cannot result in minority vote dilution. There is simply no support in the words of the Act, in the legislative history of Section 2, nor in logic for either the majority or the concurrence's embrace of such result-oriented determinations.
 
 
 258
 The position of each Administration has been that the Voting Rights Act applies to judicial elections. The current Administration goes even further and strongly urges that Section 2(b) was violated by the electoral scheme that was utilized here to elect certain Texas district court judges.
 
 
 259
 The Voting Rights Act is in no way concerned with the names or positions listed on the ballot. The United States Congress, by enacting the Voting Rights Act, has instructed that this and every other court focus on the voter, particularly the minority voter, and the efficacy of each vote cast, so as to ensure that minorities are not denied an equal opportunity to participate effectively in the democratic process.
 
 
 260
 I respectfully dissent.
 
 
 
 *
 Judges Williams and Garwood took no part in the Court's deliberations or decision of this appeal. When this case was orally argued before and considered by the court, Judge Reavley was in regular active service. He participated in both the oral argument and the en banc conference
 In United States v. American-Foreign Steamship Co., 363 U.S. 685, 80 S.Ct. 1336, 4 L.Ed.2d 1491 (1960), the Supreme Court, interpreting 28 U.S.C. Sec. 371(b), decided which senior judges are eligible to participate in an en banc court. Compare United States v. Cocke, 399 F.2d 433, 435 n. 4 (5th Cir.1968) (en banc). As Judge Reavley reads the American-Foreign Steamship Co. opinion, he considers himself ineligible now to participate in the decision of this case, and he has not therefore done so.
 
 
 [1]
 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973)
 
 
 [2]
 See, e.g., Shapiro v. United States, 335 U.S. 1, 16, 68 S.Ct. 1375, 1383, 92 L.Ed. 1787 (1948); United States v. PATCO, 653 F.2d 1134, 1138 (7th Cir.), cert. denied, 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 617 (1981)
 
 
 [3]
 It is the settled law of our Circuit that one panel of the Court does not overrule another. Ryals v. Estelle, 661 F.2d 904 (5th Cir.1981)
 
 
 [4]
 As we note in text, the section goes on to specify that election success of class members is a circumstance to be considered and to disavow specifically any intent to mandate proportionate representation by race
 
 
 [5]
 Not all aspects of that process pertain to elections, e.g., the celebrated New England town meeting
 
 
 [6]
 That scope is not at issue today, the trial court having found an absence of discriminatory intent; and we do not decide it. We point out, however, that there can be no doubt whatever that the provisions of the Fourteenth and Fifteenth Amendments, enforceable by means of Section 1983 actions, apply to judicial elections to forbid intentional discrimination in any aspect of them. City of Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980); Voter Information Project v. City of Baton Rouge, 612 F.2d 208 (5th Cir.1980)
 
 
 [7]
 James Madison, discussing the unique relationship of the representative to his constituents, for example, referred to a relationship of "intimate sympathy" between the elected and his electors, and argued that a legislator should feel an "immediate dependence" upon the will of his constituents. Frequent elections, according to Madison, are the only way to ensure this sort of relationship. Only by requiring legislators to return periodically to their constituents to seek their ongoing support and input, can the communication between the voters and their representatives that is essential to the maintenance of democratic government take place. Congress is a "popular" institution; it is, therefore inherently political
 Hickok, Judicial Selection: The Political Roots of Advice and Consent in Judicial Selection: Merit, Ideology, and Politics 4 (National Legal Center for the Public Interest 1990).
 
 
 [8]
 That this is the case is strongly implied in the Constitution, which provides for an appointive federal judiciary and was adopted by thirteen states, none of which had an elective one. Yet the Framers believed they were confecting a federal republic, and Article 4, Section 4, of the Constitution guarantees "to every State in this Union a Republican Form of Government...." But if judges hold representative offices, or represent any constituency, appointing them is scarcely consistent with a republican system, defined by the Third Edition of Webster's Unabridged as "[A] government in which supreme power resides in a body of citizens entitled to vote and is exercised by elected officers and representatives...."
 
 
 [9]
 Sagan v. Commonwealth of Pennsylvania, 542 F.Supp. 880 (W.D.Pa.1982), appeal dismissed, 714 F.2d 124 (3rd Cir.1983) (cross filing permitted by candidates for judicial office, prohibited for legislative and executive candidates)
 Concerned Citizens of Southern Ohio, Inc. v. Pine Creek Conservancy Dist., 473 F.Supp. 334 (S.D.Ohio 1977)
 The Ripon Society, Inc. v. National Republican Party, 525 F.2d 567 (D.C.Cir.1975), cert. denied, 424 U.S. 933, 96 S.Ct. 1147, 1148, 47 L.Ed.2d 341 (1976)
 Fahey v. Darigan, 405 F.Supp. 1386 (D.C.R.I.1975)
 Gilday v. Board of Elections of Hamilton County, Ohio, 472 F.2d 214 (6th Cir.1972)
 Wells v. Edwards, 347 F.Supp. 453 (M.D.La.1972), aff'd mem., 409 U.S. 1095, 93 S.Ct. 904, 34 L.Ed.2d 679 (1973)
 Buchanan v. Gilligan, 349 F.Supp. 569 (N.D.Ohio 1972)
 Holshouser v. Scott, 335 F.Supp. 928 (M.D.N.C.1971), aff'd mem., 409 U.S. 807, 93 S.Ct. 43, 34 L.Ed.2d 68 (1972)
 Sullivan v. Alabama State Bar, 295 F.Supp. 1216 (M.D.Ala.), aff'd per curiam, 394 U.S. 812, 89 S.Ct. 1486, 22 L.Ed.2d 749 (1969) (involving Board of Commissioners of Alabama State Bar)
 Irish v. Democratic-Farmer-Labor Party of Minnesota, 287 F.Supp. 794 (D.C.Minn.), aff'd, 399 F.2d 119 (8th Cir.1968)
 Buchanan v. Rhodes, 249 F.Supp. 860 (N.D.Ohio 1966), appeal dismissed, 385 U.S. 3, 87 S.Ct. 33, 17 L.Ed.2d 3 (1966), and vacated, 400 F.2d 882 (6th Cir.1968), cert. denied, 393 U.S. 839, 89 S.Ct. 118, 21 L.Ed.2d 110 (1968)
 N.Y. State Assn. of Trial Lawyers v. Rockefeller, 267 F.Supp. 148 (S.D.N.Y.1967)
 Kail v. Rockefeller, 275 F.Supp. 937 (E.D.N.Y.1967)
 Romiti v. Kerner, 256 F.Supp. 35 (N.D.Ill.1966)
 Stokes v. Fortson, 234 F.Supp. 575 (N.D.Ga.1964)
 Since 1982 a few courts have held that the use of the term "representatives" in Section 2 does not necessarily exclude judges. See Southern Christian Leadership Conference of Alabama v. Siegelman, 714 F.Supp. 511 (M.D.Ala.1989); Clark v. Edwards, 725 F.Supp. 285 (M.D.La.1988); Mallory v. Eyrich, 839 F.2d 275 (6th Cir.1988); Martin v. Allain, 658 F.Supp. 1183 (S.D.Miss.1987). (All recognizing that the "one-man, one-vote" principle does not apply to judicial elections and that, unlike legislators, judges do not "represent" those who elect them, but, nevertheless, refusing to apply its established meaning to Congress' use of the term "representatives" in Section 2 of the Voting Rights Act).
 
 
 [10]
 347 F.Supp. 453 (M.D.La.1972), aff'd mem., 409 U.S. 1095, 93 S.Ct. 904, 34 L.Ed.2d 679 (1973) (Justice White, joined by Justices Douglas and Marshall, dissenting)
 
 
 [11]
 It is interesting to note that the dissent from the panel opinion, in the very course of complaining of the majority's refusal to apply Section 2 to trial judges, candidly recognizes that judges, unlike legislative and executive officers, "represent" no one:
 When weighing a state's claim that it has a compelling interest in retaining the existing at-large system, courts should keep in mind the common sense notion that the role of judges differs from that of legislative and executive officials. Since it is not the role of judges to "represent" their constituents an examination of the "responsiveness" of the elected official to minority concerns is clearly irrelevant.
 902 F.2d at 317 n. 17.
 
 
 [12]
 In Whitcomb v. Chavis the Supreme Court directly considered a racial dilution challenge and rejected the claim that the Indiana legislative reapportionment plan operated to minimize or cancel out minority voting strength. The Court held that the mere fact that ghetto residents were not proportionately represented did not prove a constitutional violation unless they were denied equal access to the political process
 
 
 [13]
 Indeed, as the panel opinion correctly notes, many states of the Union over the course of their history have maintained an appointive judiciary, and some do so today. 902 F.2d, at 296. Given the fact, also noted there, that none of the original thirteen states elected its judiciary, an appointive system must be viewed as consistent with the "Republican Form of Government" guaranteed the States by Article 4, Section 4, of the Constitution
 In view of this, and while it is certainly possible to imagine Congress's taking the position that, while states need not elect judges, if they do so they must do so on exactly the same terms as they elect representatives, the view which it adopted seems at least equally cogent: that since the office of the judge is not to represent the popular will, and since judges are not expected to initiate significant departures in law or policy, the states need not be subjected in their selection or election to so severe and intrusive a provision as one applying a "results" test to claims of minority vote dilution.
 
 
 [14]
 Thus, as Justice Scalia has very recently suggested, we "appl[y] to the text of the statute the standard tools of legal reasoning, instead of scouring the legislative history for some scrap that is on point...." Begier v. I.R.S., --- U.S. ----, ----, 110 S.Ct. 2258, 2269, 110 L.Ed.2d 46, 63 (1990) (concurrence in judgment)
 And these small matters are indeed scourings. The panel opinion avers, 902 F.2d at 299, and we do not doubt, that the reference to "judicial districts" is the sole reference to the judiciary in all the legislative history of the 1982 amendments of the Act. It will be noted that even this reference is one to judicial districts, not to judicial candidates; and in our Circuit many officials such as sheriffs, highway commissioners, district attorneys and clerks of court, who are "representatives" and not judges, are elected from judicial districts, e.g., Miss.Code Ann. (1972) 65-1-3.
 
 
 [15]
 Both the dissent and, more obliquely, the special concurrence take our writing to task as resting on the narrow foundation of one word. In main, this is true; for the substitution of the term "representative" is all but the sole clue to be found--in either the statutory text or the legislative history--to guide the interpreter in unraveling the legislative intent behind this enigmatic statute. Dim or no, it is the only light available to guide our footsteps, and we have followed it as best we could
 By contrast, our specially concurring and dissenting brethren proceed by ignoring the sole guide available, first declaring that the only light that shines is of no help, then proceeding in total darkness and, so proceeding, to declare that the statute means, not what it says, but what they think Congress should have said--pausing briefly in passing to accuse our majority of doing what they in fact have done themselves.
 
 
 *
 When this case was orally argued before and considered by the court, Judge Reavley was in active service. He participated in both the oral argument and the en banc conference. He took senior status, however, on August 1, 1990. Based on his understanding of the Supreme Court decision in United States v. American-Foreign Steamship Corp., 363 U.S. 685, 80 S.Ct. 1336, 4 L.Ed.2d 1491 (1960), he considers himself ineligible to participate in the decision of this case, but he adheres to the views in this opinion. See Sawyer v. Butler, 881 F.2d 1273 (5th Cir.1989) and Court Policy 21.C
 
 
 [1]
 Ten counties actually are targeted. The challenged 72nd Judicial District encompasses two counties, Lubbock and Crosby. We will refer to the nine targeted Judicial Districts as nine counties
 
 
 [2]
 The same may be said for county surveyors, treasurers, court clerks and a myriad of office holders
 
 
 [3]
 It is argued that, whether or not the unamended Section 2 reached judicial elections is irrelevant, because Section 2(b) represents not just an amendment to but a fundamental shift in the operation of the Act. As such, the amended Section 2 should not be read to reach judicial elections unless Congress explicitly so provided. See Atascadero State Hospital v. Scanlon, 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). We refute this argument in the text below
 
 
 [4]
 In White v. Regester the Supreme Court interpreted the requirements of the Voting Rights Act and the U.S. Constitution with respect to claims of vote dilution:
 The plaintiffs' burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question--that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice.
 412 U.S. at 766, 93 S.Ct. at 2339.
 
 
 [5]
 Of course, when the 1982 amendments are considered in light of the Supreme Court's interpretation in Gingles, we cannot conclude that the 1982 amendments to Section 2 worked no changes from the pre-Bolden interpretation of the Act. But this is what it became, not necessarily what it was when voted upon
 
 
 [6]
 Congress dispensed with proof of purposeful violation for any voting qualifications or prerequisites to voting or standard, practice or procedure "which results in a denial or abridgement...." It did so by using the word results in both Sections 2(a) and 2(b). The word representative, so critical to defendants' argument, does not appear in the broad prohibition of Section 2(a). The Senate Report explained that the results test apply to a variety of violations
 For example, a violation could be proved by showing that the election officials made absentee ballots available to white citizens without a corresponding opportunity being given to minority citizens. See Brown v. Post, 279 F.Supp. 60, 63-64 (W.D.La.1968). Likewise, purging of voters could produce a discriminatory result if fair procedures were not followed, Toney v. White, 488 F.2d 310 (5th Cir.1973), or if the need for a purge were not shown or if opportunities for re-registration were unduly limited. Administration of an election could likewise have a discriminatory result if, for example, the information provided to voters substantially misled them in a discriminatory way. United States v. Post, 297 F.Supp. 46, 50-51 (W.D.La.1969), 412 U.S. at 769-770 [93 S.Ct. at 2341].
 S.Rep. 97-417 n. 119 p. 208.
 We decline to say that Congress intended to exempt state judicial elections from statutory regulation of these practices.
 
 
 [7]
 See, e.g., Concerned Citizens of Southern Ohio, Inc. v. Pine Creek Conservancy Dist., 473 F.Supp. 334 (S.D.Ohio 1977); The Ripon Society, Inc. v. National Republican Party, 525 F.2d 567 (D.C.Cir.1975), cert. denied, 424 U.S. 933, 96 S.Ct. 1147, 1148, 47 L.Ed.2d 341 (1976); Fahey v. Darigan, 405 F.Supp. 1386 (D.C.R.I.1975); Gilday v. Board of Elections of Hamilton County, Ohio, 472 F.2d 214 (6th Cir.1972); Wells v. Edwards, 347 F.Supp. 453 (M.D.La.1972), aff'd, 409 U.S. 1095, 93 S.Ct. 904, 34 L.Ed.2d 679 (1973); Buchanan v. Gilligan, 349 F.Supp. 569 (N.D.Ohio 1972); Holshouser v. Scott, 335 F.Supp. 928 (M.D.N.C.1971), aff'd, 409 U.S. 807, 93 S.Ct. 43, 34 L.Ed.2d 68 (1972); Irish v. Democratic-Farmer-Labor Party of Minnesota, 287 F.Supp. 794 (D.C.Minn.), aff'd, 399 F.2d 119 (8th Cir.1968). But cf. cases dealing with the Voting Rights Act, Southern Christian Leadership Conference of Alabama v. Siegelman, 714 F.Supp. 511 (M.D.Ala.1989); Clark v. Edwards, 725 F.Supp. 285 (M.D.La.1988); Mallory v. Eyrich, 839 F.2d 275 (6th Cir.1988); Martin v. Allain, 658 F.Supp. 1183 (S.D.Miss.1987); Lefkovits v. State Board of Elections, 400 F.Supp. 1005 (N.D.Ill.1975), aff'd, 424 U.S. 901, 96 S.Ct. 1092, 47 L.Ed.2d 306 (1976). To the extent that any cases from the Sixth Circuit are used to support the proposition that Section 2 of the Voting Rights Act does not encompass judicial elections, they are no longer good law, for the Sixth Circuit specifically held in Mallory v. Eyrich, 839 F.2d 275 (6th Cir.1988), that Section 2 of the Voting Rights Act applies to judicial elections
 
 
 [8]
 The changes required to be precleared in Haith had to do with the elections of trial judges. The district court did not reach the merits of any vote-dilution claims, for it had no jurisdiction to do so. New voting practices must be submitted to either the Attorney General or the United States District Court for the District of Columbia for preclearance. Other district courts only have jurisdiction to decide whether a practice is a change requiring preclearance. Consequently, the merits of a vote-dilution claim with respect to trial judges was not before the Supreme Court
 
 
 [9]
 Some see Section 5 as being the most intrusive aspect of the Voting Rights Act:
 This so-called "preclearance" requirement is one of the most extraordinary remedial provisions in an Act noted for its broad remedies. Even the Department of Justice has described it as a "substantial departure ... from ordinary concepts of our federal system"; its encroachment on state sovereignty is significant and undeniable. The section must, therefore, be read and interpreted with care.
 United States v. Sheffield Board of Comm'rs, 435 U.S. 110, 141, 98 S.Ct. 965, 984, 55 L.Ed.2d 148 (1978) (Stevens, J., dissenting) (footnote omitted). See also Katzenbach, 383 U.S. at 358-62, 86 S.Ct. at 833-35 (Black, J., dissenting).
 
 
 [10]
 The only time a district has been drawn smaller than a county was when the legislature divided both Dallas and Bexar counties into two districts, each district having jurisdiction throughout the whole county. The judge for each district was elected by the voters in the district in accordance with the constitution's command, Tex. Const. art. V, Sec. 7 (1876, amended 1985), as opposed to being elected by county-wide vote as now. Thus, we cannot say that there is no precedent for dividing counties into geographically distinct districts. We can say that the state experimented with 2 of its 25 counties but abandoned the idea nearly a century ago. The statutes dividing Bexar and Dallas Counties into two districts were repealed in 1895 and 1907, respectively
 
 
 [11]
 The district court in Clark v. Edwards, 725 F.Supp. 285 (M.D.La.1988), also held that the at-large system of electing trial judges in Louisiana impermissibly diluted black voting strength, assuming that districts with more than one judicial position were multi-member districts. In Haith v. Martin, 618 F.Supp. 410 (D.C.N.C.1985), aff'd mem., 477 U.S. 901, 106 S.Ct. 3268, 91 L.Ed.2d 559 (1986), the district court referred to the superior court judges in North Carolina, also trial judges, as "designated seats in multi-member districts." Id. at 414. The issue there was not a violation of Section 2, however, but whether Section 5 of the Act applied to such judicial elections, requiring preclearance of changes
 
 
 [12]
 Moreover, cases without minority parties, but nonetheless concerning issues important to minority groups, would have an 84.75% chance of being assigned to a judge with no accountability to minorities living in the county
 
 
 [1]
 This Court's history of courageous efforts to end racial discrimination in the South is well known. See J. Bass, Unlikely Heroes (1981). For instance, in 1973 this Court handed down a landmark Voting Rights Act decision, Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir.1973) (en banc), aff'd sub nom. East Carroll Parish School Board v. Marshall, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) (per curiam), which established an enlightened set of standards to be applied under the Voting Rights Act's "totality of the circumstances" test. The Supreme Court later cited Zimmer as the authoritative exposition of these standards. See Thornburg v. Gingles, 478 U.S. 30, 36 n. 4, 106 S.Ct. 2752, 2759 n. 4, 92 L.Ed.2d 25 (1986)
 
 
 [2]
 Purporting to apply the text of the statute, Majority Opinion, at 630 n. 14, the majority essentially concludes that the term "representative" in Section 2 of the Voting Rights Act is synonymous with the term "legislator." To the contrary, the majority is not applying the text of the statute, but rather it is applying its own novel definition of an isolated term appearing on one single occasion in the statute. Be that as it may, the majority still should never have reached the point of literally applying the text of the statute. In this Circuit, it is established law that "literal statutory construction is inappropriate if it would produce a result in conflict with the legislative purpose clearly manifested in an entire statute or statutory scheme or with clear legislative history." Almendarez v. Barrett-Fisher Co., 762 F.2d 1275, 1278 (5th Cir.1985). Conveniently, the majority opinion ignored this established law, probably because it knew that its "literal" definition of "representative" was inconsistent with other language in the Voting Rights Act and the legislative history of the Act
 
 
 [3]
 On May 27, 1988, a panel of this Court denied a Petition for Rehearing and for Rehearing En Banc in Chisom v. Edwards because "no member of this panel nor Judge in regular active service on the Court ... requested that the Court be polled on rehearing en banc." (emphasis added). Despite the denial of rehearing in Chisom concerning the applicability of Section 2 of the Voting Rights Act to judicial elections, the majority now utilizes the grant of en banc consideration in the instant case to reconsider Chisom. Such action, while certainly not prohibited, offends the familiar principle of stare decisis. It cannot be stated too adamantly: the majority of this Court is reconsidering a decision on which, just barely two years ago, no member of the Court even suggested holding the mandate in order to explore the possibility of a need to reconsider the case en banc
 The capricious path the instant case was forced to take to accomplish the rejection of Chisom v. Edwards is revealing. As late as January 11, 1990, just as a special session of the Texas legislature was convened, a panel of this Court, two members of which are now aligned with the majority position, entered an order staying the judgment of the district court in the instant case. The express intent of this order was to afford the legislature a reasonable time to address the issues presented in the federal district court's decision. In part, it recited:
 IT IS ORDERED that appellants' motion for stay pending appeal are [sic] GRANTED. We do so in order that the State of Texas may be allowed a reasonable opportunity to address the problem presented by the holding of the district court [in the instant case] entered November 8, 1989, that the state system of selecting judges is invalid as violating Section 2 of the Voting Rights Act....
 That holding, if sustained on appeal, will require an organic and wholesale review and reconstitution of the Texas judicial selection system, a task which should be addressed and carried out by the state's elected representatives, rather than by the federal courts. Only if it becomes apparent that the state is unwilling to act with measured and appropriate speed in this regard should our courts intervene. When the State has had a reasonable period within which to address the problem presented in a special session of the Legislature, the Court will entertain a motion to dissolve. That has not yet occurred; when it does, we will be amenable to a motion to dissolve the stay which we enter today.
 League of United Latin American Citizens v. Clements, No. 90-8014 (5th Cir. Jan. 11, 1990) (unpublished). The stay order, which cited Chisom and presumed the validity of Chisom, remained in effect until March 28, 1990, when it was dissolved by the panel which originally heard the instant case. That same day, the members of this Court voted to hear the case en banc on an expedited schedule. The panel opinion here was rendered on May 11, 1990, and the en banc Court heard oral arguments on June 19, 1990.
 The presumption of this Court as late as January 11, 1990, concerning the validity of Chisom and its inescapable holding that the Voting Rights Act applies to all judicial elections was obliterated like parched grass in the face of a late summer prairie fire. The fire is beyond reason or control as it races across the prairie--yet its cause is unknown.
 
 
 [4]
 The concurrence asserts that there can be no dilution of minority voting strength where the elected official acts independently, regardless of whether there are one or one hundred such official posts in the relevant district
 
 
 [5]
 See Concurring Opinion at 643
 
 
 [6]
 President Ford's poignant words are as powerful today, fifteen years later: "the right to vote is the very foundation of our American system, and nothing must interfere with this very precious right." President Gerald Ford, Remarks Upon Signing A Bill Extending the Voting Rights Act of 1965 (August 6, 1975)
 
 
 [7]
 The United States Attorneys General, in an unbroken chain, have consistently interpreted the Voting Rights Act broadly, and, more recently, have interpreted Section 2 to reach elected judges. At the time the original Voting Rights Act was passed in 1965, the Attorney General stated that "every election in which registered voters are permitted to vote would be covered." Voting Rights: Hearing Before Subcommittee No. 5 of the House Judiciary Committee, 89th Cong. 1st Sess. 21 (1965) (emphasis added). In both Chisom v. Edwards, 839 F.2d 1056 (5th Cir.), cert. denied sub nom. Roemer v. Chisom, 488 U.S. 955, 109 S.Ct. 390, 102 L.Ed.2d 379 (1988), and in the instant case, the Attorney General filed an amicus brief in which he maintains that the scope of Section 2 reaches all elections, including judicial elections
 Additionally, in a recent Section 5 preclearance review, the Assistant Attorney General denied preclearance of a proposed majority vote, designated post, at-large method of judicial elections in Georgia similar to that under attack in the instant case, concluding in part:
 Our review of a broad range of evidence in this regard indicates that polarized voting generally prevails in all of the superior court circuits now under review and there is a consistent lack of minority electoral success in at-large elections. Thus, it appears that, in the totality of the circumstances, black voters in these circuits have a limited opportunity to elect their preferred candidates....
 In addition, the state has not shown how its interests are served by circuitwide elections in many of the circuits now at issue where the at-large election feature is in apparent violation of Section 2 of the Voting Rights Act.
 Letter from Assistant Attorney General John R. Dunne to Georgia Attorney General Michael J. Bowers (Apr. 25, 1990).
 
 
 [8]
 Chisom, 839 F.2d at 1060
 
 
 [9]
 It is true that one of the Senate Report factors that may be probative in a vote dilution case to establish a Section 2(b) violation is "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." S.Rep. at 29, 1982 U.S.Code Cong. & Admin.News at 207. However, the Senate Report emphasizes that "[u]nresponsiveness is not an essential part of plaintiff's case." Id. at n. 116, 1982 U.S.Code Cong. & Admin.News at 207. In fact, in Clark v. Edwards, 725 F.Supp. 285 (M.D.La.1988), a case involving a vote dilution challenge to the use of multi-member districts and at-large voting to elect Louisiana district court, family court, and court of appeals judges, the district court remarked that the element of responsive representation simply is not a consideration in a judicial election case:
 The Senate Report ... also suggested that lack of responsiveness on the part of elected officials to the particularized need of the members of the minority group might be a factor in some cases.... That obviously is not a factor in this case since the only response which a member of the judiciary may make is to rule on all matters fairly and impartially, without favoring or being prejudiced against any group.
 Id. at 301. Consequently, while a state's interest in retaining a system which exudes an appearance of impartiality may be considered among the totality of the circumstances, the converse, actual responsiveness, should not be relevant to a claim of vote dilution in the context of a judicial election.
 
 
 [10]
 Section 2, as amended in 1982, now provides:
 (a) No voting qualification or prerequisite to voting or standard practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.
 (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
 42 U.S.C. Sec. 1973 (1982).
 
 
 [11]
 This Court, in Chisom, stressed the soundness of the Dillard court's reasoning. Chisom, 839 F.2d at 1060
 
 
 [12]
 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986)
 
 
 [13]
 Congress has acknowledged that, depending on whether the right or the wrong question is posed, courts may reach a conclusion which is totally anathema to the intent of the legislature. See, e.g., S.Rep. at 28 (discussing the "wrong test" imposed by the intent test). The concurring opinion's rear-ended approach can best be illustrated through the use of another question: Does the Act guarantee that minority interests are represented or that minorities have access to the political process? While it is undoubtedly presumed that an elected official will represent the desires of the voters, the Voting Rights Act does not speak to such a presumption. While it may seem that the two questions are simply different sides of the same coin, the distinction is one which the legislature has contemplated. If the concurrence's statement that the "right secured to minorities under Section 2 of the Voting Rights Act to not have their vote diluted is expressed in the assertion that their interests are to be represented in governmental decisions" were correct, this would lead to the absurd conclusion that a plaintiff could, pursuant to the Voting Rights Act, bring to task an elected official who has not, during his tenure in office, given proper deference to minority interests
 
 
 [14]
 Black and Hispanic judges serve as role models for other minority group members, who may not have envisioned a legal or judicial career as a real possibility in the past. In addition, minority electoral victories encourage other minority members to participate in the political process by voting and by running for office. Persistent minority defeat, on the other hand, leads to apathy among minority voters and a feeling of exclusion from the opportunity to join in the process of self-government. To assert that these interests are any less tangible because of the nature of the elected office is to pervert the very core of the Voting Rights Act
 
 
 [15]
 In fact, the concurrence concedes that "section 2, if a violation is found, can lead to the dismantling of an entire system of voting practices that may have been in place for many years." Concurring Opinion at 645
 
 
 [16]
 The concurrence repeatedly argues that affording the minority plaintiffs relief in the instant case would totally dismantle the trial-level judicial system which Texas has chosen to implement. The torch has already destroyed this straw man; as the concurrence has pointed out, Texas has structured its government such that elected trial judges often wield their power independently. Even if single member districting should be the remedy ultimately imposed in the instant case, this fundamental characterization would not be altered
 
 
 [17]
 A court reviewing a claim of vote dilution must look to the plaintiffs and whether their votes, although cast, are impotent. The plaintiffs' success depends on an adequate demonstration of vote dilution. This task may be impossible where there is only one office at issue in the relevant jurisdiction because the election of an official to such an office, with unique responsibilities over a discrete geographical area, is unlikely to have dilutive potential. In short, no divisible alternative can be made. In the instant case, however, several similar, if not identical, positions are sprinkled throughout a relevant geographic area, presenting the likely potential for vote dilution
 The concurring opinion reaches the tenuous conclusion that Congress intended Section 2 to prohibit the discriminatory dilution of minority voting strength when minorities are attempting to elect appellate court judges, but that Section 2(b) can never reach the at-large elections of trial judges--regardless of whether one or one hundred judges are elected from the same district--because the latter officials decide controversies independently. There is no support for this contention in the words of the Act, in the legislative history of Section 2, nor in logic for this result-oriented contrivance.
 
 
 [18]
 The Butts rule that a single-member office is not physically divisible has been implicitly rejected in Carrollton Branch of NAACP v. Stallings, 829 F.2d 1547 (11th Cir.1987), cert. denied sub nom. Duncan v. Carrollton, 485 U.S. 936, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988). In Stallings, plaintiffs challenged the one-person form of county commission government in Carroll County, Georgia, because it diluted minority voting strength and lessened the opportunity of black persons in the county to participate in the electoral process. This one-person system had been in effect since 1953. The Eleventh Circuit reversed the judgment in favor of the defendants, holding that the district court had applied the incorrect legal standard (in light of Gingles ) by failing to give the proper weight to the two most important factors in a Section 2 vote dilution claim: (1) the extent to which minorities had been elected, and (2) the existence of racially polarized voting. Id. at 1555
 In its brief discussion of Stallings, the concurrence mischaracterizes the Eleventh Circuit's analysis, implying that the reversal turned only on the presence of evidence indicating a discriminatory intent. In fact, the Eleventh Circuit devoted most of its discussion to an analysis of the "effects" test of Section 2 and Gingles, and to the district court's findings as to whether the single-member scheme resulted in discriminatory vote dilution. The Eleventh Circuit reversed the district court's judgment based both on its treatment of the plaintiffs' constitutional challenge, and on its treatment of the Section 2 challenge as well.
 
 
 [19]
 The concurrence heavily relies on its conclusion that the full authority of a trial judge's office is exercised exclusively by one individual. This conclusion is at odds with the true structure of the judicial system in Texas. For example, administrative matters are handled through a collegial decision-making process by the district judges within the county. Such matters include the election of a local administrative judge, the appointment of staff and support personnel, the adoption of local rules of administration, the adoption of local rules and the exercise of supervisory authority over the clerk's office. See Tex.Govt.Code Ann. Sec. 74.091 et seq. (Vernon 1988). Furthermore, the judges, functioning together as a collegial body, are charged with the responsibility of selecting by majority vote a county auditor. Id. Sec. 84.001 et seq. Moreover, the judges share authority over administration of the caseload. In Harris County, for example, fifty-nine district judges have overlapping authority to handle the heavy caseload of the district. Similarly, jury selection, case assignment, and record retention are handled on a county-wide basis. Furthermore, cases can be freely transferred between judges and any judge can work on any part of a case including preliminary matters. One district judge may, therefore, find his or her hands tied--or greatly assisted--by an earlier order imposed by another court located in the county. Tex.R.Civ.P. 330(h). In light of this overlapping authority and responsibility, it is incongruous to suggest that district court judges do in fact exercise "full" authority over the office
 
 
 [20]
 The Siegelman court concluded, and I agree, that the courts in both Butts and United States v. Dallas County Comm'n, 850 F.2d 1433 (11th Cir.1988) implicitly utilized the term "single-member office" to refer "to a situation where under no circumstances will there ever be more than one such position in a particular geographic voting area." Siegelman, 714 F.Supp. at 518
 
 
 [21]
 While creating smaller districts exists as a potential means to remedy impermissible vote dilution, it is not an exclusive remedy. A legislature is at liberty to implement any electoral system which will alleviate vote dilution
 
 
 [22]
 Dillard, 831 F.2d at 252
 
 
 [23]
 The factors include (1) the history of discrimination in the state; (2) the extent to which voting is polarized by race; (3) the existence of practices or procedures which enhance the opportunity for discrimination; (4) whether minority groups have been denied access to a candidate slating process; (5) the existence and extent of any socio-political vestiges of discrimination; (6) whether political races are characterized by overt or covert racial appeals; and (7) the extent to which minority groups have been elected in the jurisdiction. In addition, the legislative history of the Act instructs that an inquiry into the responsiveness of the elected officials to minority needs and the legitimacy of the state's asserted reasons for maintaining the existing system may provide additional insight
 
 
 [24]
 Unless these threshold Gingles factors are established, "the use of multimember districts generally will not impede the ability of minority voters to elect representatives of their choice." Gingles, 478 U.S. at 48, 106 S.Ct. at 2765
 
 
 [25]
 In holding that the current at-large scheme for electing Texas district court judges violates Section 2, the federal district court made numerous specific factual findings regarding the Gingles threshold factors as well as the Senate Report, or Zimmer, factors. For purposes of this dissent, it need not be decided whether the district court correctly determined these factual issues. It should be noted and flagged at this point, however, that the trial record is replete with evidence of an inescapable reality: minorities in the challenged Texas districts are seldom ever--indeed, are only with great rarity--able to elect minority candidates to any of the at-large district court judge positions available in the districts
 It is necessary to indicate that this writer would not affirm the interim remedial portion of the district court's order in toto. Specifically, I am constrained to conclude that the district court acted beyond the scope of its remedial powers by ordering that judicial elections be nonpartisan. The district court's order fails to defer to a political choice of the State of Texas, a choice which was not even challenged by the plaintiffs in the instant case. The district court gave no explanation for rejecting the system of partisan elections. No evidentiary hearing was held on the issue, and no factual findings were made. The equity powers of the district court neither encompass nor justify the federal district court's actions; the district court should have deferred to the State's policy choice for partisan elections as expressed in its statutory scheme.
 
 
 [26]
 The current administration endorses this approach. In an amicus brief filed in the instant case, the United States has argued that
 the proper approach is to consider, first, whether plaintiffs have met the three-part test outlined in Gingles. Assuming that this has been done, it is then appropriate to consider other factors set out in Gingles, and to weigh in particular the importance of the state's interest in the electoral system under attack.
 United States Brief at 13.
 
 
 [27]
 No opinion is expressed whether such a situation may ever be demonstrated
 
 
 [28]
 The concurrence, by treating considerations such as the appearance of impartiality and venue rules as definitive elements of the relevant elected post, has avoided the need to analyze at what point a state's asserted interest in retaining the existing scheme should be considered. As has already been discussed in footnote 16, these considerations are not part and parcel of the trial judge post
 What the concurrence has done, instead of examining the State's interest in retaining the existing scheme, is to consider the State's interest in not implementing a voting scheme similar to that imposed under the interim plan (subdistricting) in order to alleviate any potential vote dilution. This approach positions the remedy squarely in a place of incorrect prominence and foregoes any serious inquiry into the existence of impermissible vote dilution. Stated simply, the concurrence has placed the cart before the horse.
 
 
 [29]
 By articulating a threshold test which examines three characteristics of the minority group and its voting patterns, the Supreme Court has implicitly stressed the proposition that the Voting Rights Act is primarily concerned with the efficacy of the minority vote and not with the function or characteristics of the elected post
 
 
 [30]
 For example, one of the two "[a]dditional factors that in some cases have had probative value" in the Senate Report's illustrative list of totality of the circumstances factors is "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." S.Rep. No. 417, 97th Cong., 2d Sess. 29, reprinted in 1982 U.S.Code Cong. & Admin.News 177, 207. In the proceedings below, the district court considered this factor at the appropriate point--during a trial on the merits. The district court was not persuaded by defendants' defense that at-large elections served a critical state interest. The court determined that "[w]hile the Court does not find that the present system is maintained on a tenuous basis as a pretext for discrimination, the Court is not persuaded that the reasons offered for its continuation are compelling." District Court Opinion at 77
 
 
 [31]
 Because of my view that the State has not articulated a substantial interest in retaining the existing at-large system of electing district judges, the question of how much weight this factor should be afforded is not addressed. As the Supreme Court has indicated, "recognizing that some Senate Report factors are more important to multimember district vote dilution claims than others ... effectuates the intent of Congress." Gingles, 478 U.S. at 49 n. 15, 106 S.Ct. at 2765 n. 15. It is my firm belief, however, that under no circumstances should the State's interest outweigh the following factors: the extent to which minority group members have been elected to office in the jurisdiction and the extent to which voting in the elections of the jurisdiction has been racially polarized. This belief is based on my acknowledgement of the Supreme Court's indication that "[u]nder a 'functional' view of the political process mandated by Sec. 2 ... the most important Senate Report factors bearing on Sec. 2 challenges to multimember districts are [these factors.]" Id. Additionally, placing greater weight on the factors which examine minority success at the polls and racial voting patterns furthers the purpose of the Act to "correct an active history of discrimination ... [and] deal with the accumulation of discrimination." S.Rep. at 5, 1982 U.S.Code Cong. & Admin.News at 182
 
 
 [32]
 In Martin v. Allain, 658 F.Supp. 1183, 1195-96 (S.D.Miss.1987), the court adopted a single-member district remedy for some Mississippi trial judges who were elected at-large in racially dilutive elections, after finding that Mississippi already elected some other judges from areas smaller than the court's jurisdiction. The court there stated:
 Although the state has adopted the policy of the post system of electing judges in multi-member judicial districts above the justice court level, it long ago adopted the policy of single-member electoral districts for justice court judges. The state also has the policy of judges deciding cases which may originate outside their election districts.
 
 
 [33]
 Once again, the concurrence's asserted concern is premised on the anticipated remedy--subdistricting. While the Supreme Court, in Gingles, did indicate that a "single-member district is generally the appropriate standard against which to measure minority group potential to elect," it did not mandate the imposition of subdistricts to remedy every instance of illegal vote dilution. The concurrence, by erroneously factoring in, at the liability phase, concerns which may never be borne out, refuses to properly acknowledge the intent of the Voting Rights Act
 
 
 [34]
 It is also notable that one judge, an intervenor in the instant case, testified that he was not aware of any allegations of unfairness or suggestions that white litigants were not treated fairly by minority judges elected from subcounty Justice of the Peace precincts
 
 
 [35]
 It should be noted that the Texas Constitution limits the State's interest in establishing specialty courts; the state supreme court has ruled that the legislature may not disturb state courts' jurisdiction
 
 
 [36]
 Because the district court, in its interim plan, indicated the belief that a remedy could be created which allows the substantial use of the Texas system of specialty courts, District Court Order at 7, this writing expresses no view on whether or not a state's interest would be substantially stronger if such a remedy could not be devised
 
 
 [37]
 South Carolina v. Katzenbach, 383 U.S. 301, 308, 86 S.Ct. 803, 808, 15 L.Ed.2d 769 (1966)